## LELAND SHUMATE v. THE STATE.

### No. 1577. Decided November 3, 1897.

1. **Murder—Evidence—Continuous Difficulties—Practice as to Introduction of Testimony.**

On a trial for murder, where there were prior encounters in which several parties were participants, all occurring within a brief space of time and in effect one transaction, with scarcely a lull or cessation of the fighting, until the homicide was committed; and the State, in the examination of her witnesses, did not go into the origin of the difficulty, but was allowed by the court to confine the testimony to the immediate facts attending the shooting and death of deceased, and defendant thereafter was refused the privilege of developing the origin of the difficulty by a cross-examination of said witnesses. Held, error. The prosecution should have been required to fully develop the State's case where, under the facts, it was impossible to understand the character of the homicide without a knowledge of all that occurred between the parties immediately preceding it.

2. **Same.**

After defendant, as stated in the foregoing paragraph, had been denied the right to cross-examine the State's witnesses, and was compelled to introduce his evidence as to the origin of the difficulty, he examined one witness and rested. The State was then permitted to introduce the same witnesses in rebuttal, whose cross-examination had previously been denied to defendant. Defendant then proposed to introduce witnesses in rebuttal of this latter testimony, which the court refused him the right to do; Held, error. After the State had thus finally developed the case by

its witnesses, defendant had the right to rebut the State's case, and he could not be deprived of this right by the arbitrary ruling of the judge in the first place, which had erroneously cut the State's case in two, and would not permit defendant to cross-examine the State's witnesses upon the whole case.

**3. Same—Manslaughter—Defense of Another—Motive—Charge.**

On a trial for murder, where it appeared that a difficulty was taking place between the brother of defendant and the deceased and other parties, and defendant interfered and was stricken a blow by deceased with a pistol; that he retreated a short distance, procured a shotgun, and returning found deceased and his brother in a struggle, deceased being in the act of shooting his brother, whereupon he shot and killed deceased; and the court, on justifiable homicide, charged the jury, in effect, among other matters, that if they believed the defendant shot and killed deceased partly from a motive of revenge and partly to save his brother, that he would be guilty—that is, if they believed defendant was partly actuated by malice on account of the blow deceased had given him and partly actuated by a motive of self-defense or defense of his brother, to attribute his act to the graver motive—that is, to his malice; Held, error.

**4. Same—Where the Evidence Discloses Two or More Intents or Purposes.**

If, moved by more intents than one, a man does what the law forbids, some intents being elements in the crime and others not, the latter do not vitiate the former, which, in their consequences, are the same as though they stood alone. If, from the facts stated in the foregoing paragraph, defendant's act was done in his own self-defense, or in defense of his brother's life, the law would not stop to inquire if he also entertained a grudge against the deceased, but he would be justified upon the ground of self-defense or defense of another, and the court should have so instructed the jury, unhampered with other matter.

**5. Same—Defense of Another—Resort to Other Means—Charge.**

On a trial for murder, where the testimony showed that defendant was justifiable, if at all, it was because deceased was making an assault upon his brother with a pistol, and was in the act of taking the latter's life, he was not required to resort to any other means before killing, and it was error to give a charge predicated upon the doctrine of a necessity of having resorted to all other means.

**6. Evidence—Exclamations of Participants.**

On a trial for murder, exclamations and remarks of those engaged in the difficulty are admissible in evidence. When made dum fervet opus, they constitute part of the transaction.

APPEAL from the District Court of Grayson. Tried below before Hon. DON A. BLISS.

Appeal from a conviction for manslaughter; penalty, two years imprisonment in the pentitentiary.

The indictment charged defendant with the murder of H. M. Fuller, on September 9, 1896.

The following statement of the case, taken from brief of appellant, is substantially correct:

On the night of September 8, 1896, there was a dance in the country at the residence of W. M. Hobbs. The Hobbs residence is about five miles south of Sherman, in a little grove containing four acres; the house is in the extreme western edge of the grove, is a two-room house, the rooms being about fifteen feet square, and extending the long way north and south; there are doors in the east side of each room, one in the north side of the north room, and in the west side of the south room; there is a window in the south side of the south room, and in the west side of the north room; these doors and windows are about the center of the respective sides in which they are located. There is a well in the grove

about fifteen steps south of east of the residence. On the night in question there was a lemonade and ice cream stand about thirty steps east of the residence, where ice cream and lemonade were dispensed to the warm and thirsty while the assembled gallantry and beauty were dancing on a platform erected about ten steps southeast of the lemonade stand. The night was dark, and lights were provided at and near the lemonade stand and the dance platform, while the other parts of the grounds were dark. Early in the evening Hobbs placed a double-barreled shotgun in the lemonade stand, loaded with small shot. Appellant, who is 23 years old, and his twin brothers, Jim and Tom, aged 26 years, lived three miles west of Sherman; appellant and his two brothers had been acquainted with Hobbs two years, and attended the dance; appellant and his brother Tom went in a buggy; Jim and a neighbor boy, Aaron Payne, went horseback, and arrived at Hobbs' about 9 o'clock; appellant and Tom arrived ahead of Jim. On the way to the dance Jim saw Aaron Payne have some brass knucks. Tom Shumate had a pint of wine that night, but did not drink it.

Deceased (Hugh M. Fuller), his brother, Dr. Tom Fuller, Dr. Sam Maxey, and Dr. W. T. Salmon lived in Sherman, and they also attended the dance at Hobbs'; they were all young men, and none of them were acquainted with Hobbs. Maxey was acquainted with the Shumate boys, and was distantly related to them. The Fuller boys and the Shumate boys were not acquainted with each other, and Salmon and the Shumate boys were unacquainted. The Fuller boys, Salmon, and Maxey, had been drinking some during the afternoon before the dance, and on the way to the dance they consumed a dozen pints of beer. Salmon also carried a quart of whisky, but very little of this was drank. The Fullers, Maxey, and Salmon, arrived at Hobbs' about 9:15, and the indications are that at least Maxey was under the influence of liquor. Soon after his arrival Maxey asked Jim Shumate for whisky, and Jim told him he had none. Later, when Maxey, the Fullers, and Salmon were together, Jim asked Maxey for whisky, and Maxey told him he had none. After they had been at the dance awhile, Maxey, Salmon, Tom Fuller, Hugh Fuller, Aaron Payne, Tom Shumate, and Jim Shumate met on the west side of the Hobbs residence, where it was dark, and an altercation between Sam Maxey and Jim Shumate arose, in which some abusive language and profanity was indulged in; during this altercation Jim got some knucks from Aaron Payne. This altercation resulted in the deceased, Hugh Fuller, and Jim Shumate getting into a fight, in which deceased used a heavy pistol as a bludgeon, and Jim Shumate used his brass knucks, and the fight was waged with fury for some time. Deceased struck the first lick. There were others fighting also, but who they were and what they did does not clearly appear. Sometimes they were standing and striking, sometimes they were clinched, sometimes they were down on the ground fighting. Tom Shumate received several wounds through the skin on the head, but struck nobody; Tom Fuller had Tom Shumate down on the ground; Salmon prevented Maxey from participating in the

fight at the first. Salmon left to get somebody to part the fighters, and went around on the east side of the house. Maxey pulled Hugh Fuller off Jim Shumate, and separated Tom Fuller from Tom Shumate, and left the immediate scene of the difficulty and went out north of the lemonade stand and stopped. Tom Fuller followed Maxey, went out northeast of the house and stopped; Tom Shumate left and went into the house, leaving Jim Shumate and Hugh Fuller on the west side of the house, and a number of others whose identity is not known. While Jim Shumate and Hugh Fuller were fighting near the northwest corner of the house the defendant, Leland Shumate, ran in between them and said: "Hold up; what does this mean? There ain't no use of this;" and deceased struck him over the head with a pistol. Defendant left, and bare-headed, pale, looking scared, and with blood running down his face, ran to the lemonade stand, got the gun, and ran back toward the west side of the house.

After deceased struck defendant he and Jim Shumate resumed their fight, and Jim Shumate tells the only coherent story of what subsequently transpired. From his story, which in some points is slightly contradicted, and in some corroborated, we learn that they fought down toward the southwest corner of the house, when deceased knocked Jim Shumate down; that deceased and others got on Jim Shumate. About this time defendant ran up with a gun in his hand and struck with it right and left on those on top of Jim and told them to scatter out. Jim Shumate got up, and he and deceased resumed the fight, when deceased threw the pistol down in Jim's face and fired. Jim pushed the pistol to one side. Deceased then took both hands and fired the pistol, when Jim again pushed it to one side. Then Jim couldn't see it, but defendant fired the shotgun and inflicted a circular wound three inches in diameter in the abdomen of deceased. Deceased fell, and as he fell he fired the pistol again. Jim Shumate fell with deceased and took the pistol from him. Deceased continued to live after he was wounded for two hours, when he died from the effect of the wound in the abdomen. Deceased fell south of the house. Besides the wound in the abdomen he had three wounds through the skin on his head; Tom Fuller had a wound through the skin on his head; Jim Shumate had four wounds through the skin on his head, a wound on the back of his right hand, a broken bone in his right hand, had powder burn on his left hand and on his left cheek; defendant had three wounds on the head through the skin, and all of the Shumate boys were bloody.

After the shooting somebody exclaimed, "Where is Dr. Maxey, a son of a bitch? I have another load for him;" and "Die, you son of a bitch; you deserve to die." A short time after the shooting, about fifteen feet east of where deceased fell, a double-barrel shotgun was found with a loaded and an empty shell in it, and with the left hammer off. The pistol that Jim Shumate took from deceased had three loaded cartridges in it and three hulls that had been fired. This pistol had "H. M. F." cut on it, and was in the possession of Jim Shumate when he and his two

brothers were arrested the evening after the homicide. After the shooting the Shumates left Hobbs', went by home, and got horses and started for their sister's home in the Indian Territory. They were arrested about thirty-five miles northwest of Sherman in the afternoon of the day after the homicide. When arrested they were traveling at a moderate gait along a public road, and had no weapon except the one pistol.

There was evidence that when the first shot was fired a man threw up his hands and staggered. The preponderance of the evidence was that the pistol fired before the gun. The preponderance of the evidence is that the shooting occurred along in quick succession, and at the south end of the house, but a witness (Ford) says that the pistol shots occurred between two men fighting at the northwest corner of the house some four minutes before the fatal shot was fired, and that deceased was walking slowly past the southwest corner of the house and turned around, when appellant said, "Where is the son of a bitch?" and that then appellant shot him.

*Randell, Cobb, Hazlewood,* and *Smith & Tolbert,* for appellant.—The common law rule as to the examination of witnesses does not prevail in this State, but they shall be introduced and examined in the way necessary to a true administration of justice. Morris v. State, 30 Texas Crim. App., 116; Rhine v. Blake, 59 Texas, 240; Markham v. Carothers, 47 Texas, 21; Ayres v. Harris, 77 Texas, 103.

Under the rules recognized by the courts of this State, appellant was only bound to make a prima facie case in opening this new matter of his defense in this case, and he had a right to reserve his confirmatory evidence until he finds the point of attack. This is the rule laid down in Markham v. Carothers, and for a failure in the court to recognize this rule in that case it was reversed on appeal. The reason is stronger in this case, being a criminal case, than it could be in any civil case. It is true that the court says that he knew that appellant was holding back certain testimony at the time he closed his case, but notwithstanding this knowledge of the court, we submit that appellant had a right to stand on his testimony of one witness until that testimony was attacked, and that the court erred in not permitting appellant to strengthen that testimony when attacked. The evidence which appellant expected to elicit from his brother Tom Shumate and himself being the same or substantially the same as that of the witness Jim Shumate, was highly material, and it was important that the jury should know it and hear it in arriving at a just verdict as to the facts in this case.

On account of the refusal of the court to permit appellant to cross-examine the witnesses Fuller and Salmon as to the first part of the difficulty in the first place, and the further refusal of the court to permit appellant to introduce his witnesses, Tom Shumate and himself, in rebuttal of the testimony of Salmon, Fuller, and Maxey, was such error as should reverse this case.

The charge, "If the said H. M. Fuller made an unlawful assault and battery upon the said Jim Shumate, and if the acts of the said H. M. Fuller in such difficulty were of such a nature as to make the defendant reasonably believe that Jim Shumate's life or limb would be endangered thereby, and defendant so believing went away and procured a gun and returned, and if upon his return it reasonably appeared to him that said Jim Shumate was in great imminent danger of losing his life or of suffering serious bodily injury at the hands of the said H. M. Fuller, and the defendant shot and killed the said Fuller with the sole motive of saving the said Jim Shumate, then the defendant would be guilty of no offense, unless you should believe from the evidence that under the circumstances the defendant would and should have resorted to other means to prevent the said Fuller from killing the said Jim Shumate before resorting to the gun, and that a man of ordinary temper and prudence would have resorted to other means, and that other means, if resorted to, would have prevented the said Fuller from killing the said Shumate," is erroneous. Kendall v. State, 8 Texas Crim. App., 569; Orman v. State, 24 Texas Crim. App., 495.

There are but two articles of the statutes under which this charge of the court could have been given—articles 675 and 677 of the Penal Code. If it was given under article 675, it is erroneous, because it requires appellant to first resort to other means to prevent the attempted murder before he kills. If it was intended by the court that this charge should be given under article 677, Penal Code, it is error, because the evidence does not authorize the giving of such a charge under the facts of this case. The court instructed the jury on the hypothesis that Fuller was making an unlawful assault. The character of the weapon used and the circumstances of the assault clearly indicate that the assault was a murderous assault, and article 677, which applies to assaults of a milder character, had no application to the facts of this case. · The charge should not have been given, and because it was given, the case should be reversed.

If the homicide be committed under circumstances of justification with lawful intent, the law excuses the homicide, even though at the time of the homicide there be other subordinate intents in the mind of the slayer.

It is well settled in this State, that if in killing the deceased appellant was actuated by malice, he would be guilty of murder, no matter what the circumstances of the killing were. It is equally well settled, that if he killed deceased under circumstances that clearly indicate that deceased was about to take the life of his brother Jim Shumate unlawfully, for the purpose of saving his brother's life, appellant would be excusable under the law for such killing. If the circumstances of justification existed, if the intent to save his brother existed in the mind of appellant with the circumstances, no matter what other intent may have existed in his mind, appellant was not partly but wholly excused by the law.

Mr. Bishop says: "In the affairs of life it is seldom a man does any one thing prompted by one motive alone to accomplish one end. As, in the material world, all the laws of nature are constantly operating together, so, in the world of human existence, all the motives about a man are continually exerting their power upon him." Bishop's Crim. Law, 337.

"As a general truth, the criminal law does not take within its cognizance all the motives of men, but only particular ones within its jurisdiction." Bishop's Crim. Law, 338.

In the well considered case of the State v. Johnson, cited above, where question under consideration before the Supreme Court of North Carolina was whether a homicide should be attributed to a former grudge or a recent provocation, Gaston, Justice, used this language: "There can be no such thing in law as a killing with malice and also upon the furor brevis of passion; and provocation furnishes no extenuation, unless it produces passion. Malice excludes passion. Passion presupposes the absence of malice. In law they can not coexist."

If the proposition announced in Johnson's Case be sound, then in legal contemplation it is impossible that the lawful intent and express malice should coexist; if they can not coexist, then the theory submitted to the jury in this case by the court's charge is wrong. In few acts are men actuated by one motive alone. If in this case appellant was actuated by the motive of saving his brother's life, if that motive predominated in his mind, the fact that other subordinate motives may have also existed in his mind would not in any manner impair his excuse at law.

The submission to the jury in this case of coexisting motives in the mind of appellant is a refinement, while perhaps good in theory, yet too nice when it comes to practice. It would be impossible in most instances, under the circumstances of the homicide in this case, for a very intelligent man to analyze and say what motives existed in his mind at the time of the homicide. When the question arises for a jury to make a qualitative and quantitative analysis of the motives of another man's mind, we think it an unnecessary refinement of law that gets beyond the pale of practical things. We submit that this theory in a few words could have been submitted to the jury in this case. If the motive was to save his brother's life, then the homicide is excusable; if the homicide was from malice, the killing is murder. In giving the charge in this case the court erred, for which error this case ought to be reversed.

*Silas Hare, Jr., G. P. Webb, C. L. Vowell,* and *Mann Trice,* Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—Appellant was convicted of manslaughter, and given two years in the penitentiary; hence this appeal.

The following bill of exceptions appears in the record, to wit: "Be it remembered that on the trial of the above entitled cause, when the State was introducing its testimony, and was making its case in the first place,

and the witnesses W. T. Salmon and Tom Fuller were on the witness stand, and had testified to the facts of the shooting, wounding, and killing of the deceased, that defendant asked said witnesses on cross-examination as to how a difficulty between Jim Shumate and deceased and one between Tom Fuller and Tom Shumate originated, and the circumstances of the origin of the difficulty between deceased and one Jim Shumate, and the other details of the said difficulties between deceased and Jim Shumate, and between Tom Fuller and Tom Shumate, to which testimony the State objected, on the ground that it was not cross-examination, and said objection was sustained by the court, and such testimony was at that time excluded. That after the State had closed its case, and when defendant was introducing his testimony, he introduced as a witness in this case Jim Shumate, who testified in detail to every circumstance of the trouble between himself and his two brothers, Tom and Leland, and the deceased, Hugh Fuller, and Sam Maxey and W. T. Salmon, including the details of the inception of the fight and of all the difficulty up to and including the circumstances of the shooting and killing. Afterwards, and in rebuttal, the State introduced Tom Fuller, W. T. Salmon, and Sam Maxey, who at that time testified in detail to all of the circumstances of the beginning of the altercation between deceased and Jim Shumate and others, and all of the circumstances of that difficulty from the beginning up to the circumstances of the shooting, but did not testify as to the circumstances of the shooting, and in said testimony contradicted the testimony of Jim Shumate in many important particulars. That, after the State had again closed its testimony, the defendant offered, as witnesses in his behalf, Tom Shumate and himself, the defendant (Leland Shumate), and proposed to show by them the circumstances of the origin of the altercation between Jim Shumate and deceased, and the beginning of the altercation and all of the circumstances of the same up to the fact of the shooting, to which testimony the State interposed the objection that the same was not in rebuttal, but was cumulative of Jim Shumate's testimony, which objection was sustained by the court, and said witnesses were not permitted to testify as to said matters. That if the said Tom Shumate and the said Leland Shumate, the defendant, had been permitted to testify as to the origin of the said difficulty, and as to the circumstances of the same up to the time of the shooting, they would have testified to substantially the same facts testified to herein by Jim Shumate, at the instance of the defendant, as appears in the transcript, to which action of the court in excluding the evidence of Tom Shumate and of Leland Shumate the defendant excepts, and tenders this, his bill of exceptions number 19. This bill is approved with the explanation that the examination of the witnesses in chief was protracted by counsel to an extreme, tedious, and, as the court deemed, an unnecessary, length; and, when counsel for the defendant announced that the defendant closed his examination in chief, the court, anticipating that counsel for defendant were holding back some testi-

mony which should be introduced in chief, gave fair warning that the examination would from that time on be confined strictly to rebuttal testimony. Notwithstanding this warning given by the court at the time, defendant never offered himself nor his brother Tom Shumate in chief. The witness Tom Shumate was allowed by the court to testify, and did testify, in behalf of the defendant in rebuttal; and the court stated to counsel for defendant that the defendant could testify to any facts in rebuttal if he desired to do so, but his testimony would be confined strictly to rebuttal. [Signed]    Don A. Bliss, Judge."

To condense: The State introduced witnesses, and proved the facts attending the shooting and death of the deceased, Fuller. The State did not go into the circumstances attending the origin of the difficulty between these parties or any of them, but confined the testimony to the immediate facts attending the shooting and death of the deceased. Appellant proposed, in cross-examination of the State's witnesses, to go into the circumstances attending the origin of the difficulty. He was refused this privilege. After a careful perusal of the statement of facts, we believe that the difficulty in which the deceased lost his life was one entire transaction. It is true that the testimony shows some fighting between deceased and his brother, on the one side, and the brothers of defendant on the other. There is some controversy between the State's evidence and defendant's testimony as to whether defendant was engaged in these prior difficulties; but all that occurred there was within a very brief space of time. There was hardly a cessation or lull in the fighting, from its beginning until the homicide was committed. It was all, in effect, one transaction, and it is impossible to understand the homicide itself without having before us all that occurred there between the parties immediately preceding it. The State undertook, however, under the sanction of the judge, to confine its testimony to the act of killing and the circumstances immediately surrounding it.

We believe, under the rules of evidence prescribed for criminal cases, that it was the duty of the prosecution to have entirely developed the State's case before the defendant was called upon to put in any testimony; and it could not fairly develop its case until the State had put in evidence all that occurred between the respective parties on the night of the homicide. If this course had been pursued, then the defendant would have had the opportunity of cross-examining the State's witnesses upon the whole case before he was required to call the witnesses on his own behalf. He would have known exactly the shape of the State's case upon the entire transaction before introducing his own witnesses; but the court, instead of requiring this course to be pursued, cut the State's case in twain, and then would not even permit the defendant to cross-examine the State's witnesses upon the circumstances preceding the homicide on that occasion. Appellant did not choose to make the State's witnesses his own, but it appears, under the ruling of the court, was compelled to introduce his evidence as to the origin of the difficulty. He introduced one witness, and rested. The State was then permitted to in-

troduce the same witnesses it had previously put upon the stand, and the defendant then proposed to introduce his brother Tom and himself in rebuttal of the State's testimony. The court declined to permit him to do this, and in explanation states that he had warned defendant previously that he would confine the evidence strictly to rebuttal, as he apprehended that defendant was saving something back.

It occcurs to us that the error was committed by the court in the first instance in allowing the prosecution to examine its witnesses only on a part of one transaction, and then in refusing to permit the defendant to cross-examine these State witnesses upon the entire transaction, including the most important part thereof, to wit, the origin of the difficulty; and, having committed this error against the defendant, it could not deprive him of the right to have the State develop its full case before he was required to close his testimony upon the issues made by the State; and, after the State had fully developed its case by its own witnesses, the defendant then had a right to introduce his witnesses, and to rebut the State's case, and he could not be deprived of this right by the arbitrary ruling of the judge in the first instance, and the court should have admitted the testimony of the appellant himself and his brother Tom Shumate.

The theory of the State was, and the testimony on its behalf tended to show, that the difficulty occurred at a party at night; that on the one side was the defendant and his two brothers and one Payne, and on the other side were the two Fuller brothers and Maxey; and that in said difficulty the defendant and his crowd were the aggressors, or at least they entered into the conflict and fought willingly. Further it was contended that, however the difficulty may have originated, there was a lull in the difficulty, and the defendant interfered, and was stricken a blow by the deceased, and that he immediately retired from the conflict a short distance, procured a gun, and, when he returned, the deceased and his brother were engaged in a struggle, in which defendant's brother's (Tom's) life was in danger, and that the defendant then shot and killed the deceased, and that at the least, such killing was manslaughter. On the part of the defendant it was insisted that the proof on his behalf showed that the deceased and his party were the aggressors and brought on the difficulty, and that he and his party fought purely in self-defense. It was further urged that, whoever might have been the aggressors in the origin of the difficulty, defendant was not present at the time, was not aware as to who was in the wrong, and that, when he came upon the scene, he found his brother Tom and deceased engaged in a difficulty. He interfered as a peacemaker, and deceased immediately struck him a blow over the head with a pistol. He immediately retreated a short distance, procured a gun, returned, and then found deceased and his brother Tom engaged in a struggle, in which the deceased was using a pistol, and was in the act of taking his brother's life; and under such circumstances he shot and killed deceased, and he claims that under such conditions he was justifiable in doing so.

On the subject of self-defense the court instructed the jury as follows:

"So, of course, if you should believe from the evidence that at the time the defendant killed the said H. M. Fuller, if he did kill him, it reasonably appeared to the defendant, looking at the circumstances from the defendant's standpoint, at the time, that Jim Shumate was in present, imminent peril of losing his life or suffering serious bodily injury at the hands of the said H. M. Fuller, and that the defendant shot and killed the said H. M. Fuller for the sole purpose of saving the said Jim Shumate from said danger, and from no other motive; or if the evidence leaves in your minds a reasonable doubt that the defendant killed the said Fuller from any other motive than to save the said Jim Shumate from said danger, you will find him not guilty, unless you should believe from the evidence beyond a reasonable doubt that the said Jim Shumate, by his own wrongful act, brought on the necessity or apparent necessity of killing the said Fuller, and that defendant knew this or had good reason to believe this at the time he did the killing.

"In this connection, you are instructed, that if you believe from the evidence that defendant and his brothers Jim Shumate and Tom Shumate had a difficulty with H. M. Fuller and Tom Fuller, in the course of which the defendant received injuries, and that defendant left the immediate scene of the difficulty with the intent to kill H. M. Fuller, and, in pursuance of such intent, did shoot the said Fuller and thereby kill him, from a motive of revenge or of manslaughter, and this even though at the time he did the shooting his brother might have been in present, imminent peril; and if, under such circumstances, the defendant shot the said H. M. Fuller, partly from a motive of revenge, and partly to save his brother, he would be guilty. In other words, for the homicide to have been justifiable, defendant's sole motive in doing the killing, if he did do the shooting, must have been to save his brother. In such a case he would be guilty of murder in the first degree, if he formed the design to kill while his mind was sufficiently cool to enable him to contemplate the nature and probable consequences of his act. He would be guilty of murder in the second degree if he did the killing in a sudden transport of passion produced by no 'adequate cause,' as that expression has been explained to you. He would be guilty of manslaughter if he did the killing 'under the immediate influence of sudden passion' produced by 'an adequate cause,' as those expressions have been explained to you.

"In this connection you are further instructed, that if you believe from the evidence that Jim Shumate, by his own wrongful act, brought on the danger of his being killed or of suffering serious bodily injuries at the hands of H. M. Fuller (if there was such danger); and if you further believe from the evidence, beyond a reasonable doubt, that defendant knew this, or had good reason to believe this—and so knowing or having good reason to believe, shot and killed the said Fuller—he would be guilty; and this even though you should believe from the evidence that defendant's sole motive in doing the shooting was to save Jim Shumate from said danger. But in such case, if defendant's sole motive in doing

the shooting was to save Jim Shumate, he would be guilty of no higher grade of offense than manslaughter.

"In this connection you are further instructed, that if you should believe from the evidence that there was a fight between H. M. Fuller and Jim Shumate, and that in the course of such fight the said Fuller, while his mind was in such a condition that he could contemplate the nature and consequences of his act, formed the design to kill the said Shumate, not in defense of his own life, or to prevent his suffering serious bodily injury at the hands of the said Jim Shumate, and that the said Fuller proceeded to execute said design by attempting to kill the said Jim Shumate, then, under such circumstances, such an attempt would be an attempt to murder the said Jim Shumate; and if the defendant, under such circumstances, shot and killed the said Fuller with the sole motive of saving the said Jim Shumate, then he would not be guilty of any offense, no matter who was in the wrong at the beginning of the difficulty.

"Again, if the said H. M. Fuller made an unlawful assault and battery upon the said Jim Shumate, and if the acts of the said H. M. Fuller in such difficulty were of such a nature as to make the defendant reasonably believe that Jim Shumate's life or limb would be endangered thereby, and if defendant so believed, and went away and procured a gun, and returned; and if upon his return it reasonably appeared to him that said Jim Shumate was in present, imminent danger of losing his life or of suffering serious bodily injury at the hands of the said H. M. Fuller, and the defendant shot and killed the said Fuller with the sole motive of saving the said Jim Shumate, then the defendant would be guilty of no offense, unless you should believe from the evidence that, under the circumstances, the defendant would and should have resorted to other means to prevent the said Fuller from killing the said Jim Shumate, before resorting to the gun, and that a man of ordinary temper and prudence would have resorted to other means, and that such other means, if resorted to, would have prevented the said Fuller from killing the said Shumate. And the law, as set forth in this paragraph, would also apply, no matter whether H. M. Fuller or Jim Shumate were in the wrong in bringing on the difficulty, if the defendant, at the time of killing, was ignorant as to which one was the aggressor."

The testimony for the appellant demanded an instruction upon two phases of the case, to wit, manslaughter arising from the blow given defendant by deceased with the pistol when he interfered in the difficulty between deceased and Jim Shumate, and, second, upon justifiable homicide, predicated upon the theory that, when defendant shot deceased, his brother's life was then in imminent danger. The court, in his charge upon manslaughter, defined the essential elements constituting said offense as given by the statute. It then instructed the jury that, "if they believed defendant shot and killed deceased, not in necessary defense of Jim Shumate, when said Shumate was in imminent peril, real or apparent, of losing his life or suffering serious bodily injury at the hands of

said H. M. Fuller, but under the immediate influence of sudden passion produced by adequate cause, as this expression has been explained to you, shot and killed deceased, you will find him guilty of manslaughter," etc.

Now, we believe, in order to present this subject properly before the jury, the court should have instructed them directly upon the phase of the testimony which presented the issue of manslaughter. He should have told the jury that if defendant came up while deceased, H. M. Fuller, and his brother, Jim Shumate, were fighting, and attempted to interfere and stop the difficulty, and deceased immediately struck him a severe blow over the head with a pistol, and this excited his passion so as to render him incapable of cool reflection, and under such circumstances he shot and killed deceased, it would be no more than manslaughter. We have quoted above the charge in part as given by the court on justifiable homicide. It will be noted that in one of said above-mentioned charges the court instructed the jury if they believed defendant shot and killed Fuller for the sole purpose of saving said Jim Shumate's life, and from no other motive, to acquit; and the court further instructed the jury, on this same line, that, if they believed from the testimony that the defendant shot and killed deceased, partly from a motive of revenge and partly to save his brother, he would be guilty; that is, as we understand it, the jury were told that, if they believed that the defendant was partly actuated by malice and partly actuated by a motive of self-defense or defense of his brother, to attribute his act to the graver motive—that is, to his malice. Mr. Bishop says: Section 338: "As a general truth, criminal law does not take cognizance of all the motives of man, but only of the particular ones within its jurisdiction, just as it does not assume control over all the other acts; and it is immaterial what motives operated on the mind of the accused person, or what were inoperative, provided the law's motives did or did not sway him." Section 339: "If, moved by more intents than one, a man does what the law forbids, some intents being elements in the crime, and others not, the latter do not vitiate the former, which in their consequences are the same as though they stood alone." Now, it would appear from this that there is no separation of motive; that, if the act was done unlawfully and of malice in this case, the law would not stop to inquire what other motive may have actuated the defendant; but if, on the other hand, the act was done in his own self-defense, or in defense of his brother's life, the law would not stop to inquire if he also entertained a grudge against the deceased. But the court did not separate these motives, and the jury were, in effect, instructed that, although the defendant may have killed deceased in defense of his brother's life, yet, if he was also actuated by malice or by passion arising from the blow towards the deceased, he would not be justifiable.

The phase of the case most urged on behalf of the defendant was that, during a momentary cessation in the difficulty between deceased and his brother Jim Shumate, defendant stepped up and endeavored to suppress the difficulty, when the deceased struck him a severe blow over the head

with a pistol. He stepped aside a short distance (ten or fifteen steps), procured a gun, and immediately returned. When he returned, deceased, who had already. fired twice at defendant's brother, was apparently in the act of shooting again, when defendant fired the fatal shot. No doubt, when the defendant retired to get the gun, he was smarting under a sense of injury from the blow received, and may have entertained malice or passion towards the deceased. When he returned with the gun he may have still entertained this malice or passion, and he may have intended (but this is speculating) to kill defendant on account of the blow he had received. But, when he returned, the conditions were all changed. He beheld the deceased, who had recently struck him over the head with a pistol, in the act of slaying his brother. Now, can it be said, because he may have intended to kill deceased for the blow inflicted upon him, that, although at the time he killed him deceased was then about to slay his brother, he killed him because of the blow he had previously received? We think not. Yet the charge of the court, in effect, instructed the jury that, if they believed defendant killed deceased in part to protect his brother's life and in part because of revenge, to find him guilty. If the court's charge is correct, it was impossible for the jury to acquit appellant, for they could have never determined definitely which motive prompted the killing. To acquit, they were required to believe that defendant did not kill deceased from the passion aroused from the blow; they were required to believe that this motive or cause was not acting upon him when he fired the fatal shot, though they might have believed that he acted to save his brother's life. As before stated, this is a refinement that has no place in the law. We believe, under the facts of this case, that the court should have submitted on the issue of self-defense, in a well defined charge presenting that phase of the case suggested by defendant's testimony, to wit, if defendant, not knowing who was the aggessor in the beginning of the difficulty, found his brother and deceased engaged in a difficulty, and immediately interfered to separate them, and deceased then assaulted him, and he then retired a few steps, and procured a gun, and returned, and then found deceased in the act of taking the life of his brother, and he killed him in order to save his brother's life, to then acquit him. The testimony presented this phase of self-defense, and the defendant was entitled to the benefit of it, unhampered with other matter.

Again, the court required the jury to believe, before they could acquit, that defendant resorted to all other means, except shooting deceased, to save his brother's life. As we understand the testimony, if defendant was justified in shooting deceased at all, it was because deceased was making an assault on his brother with a pistol, and was in the act of taking his life. Under this state of case, he was not required to resort to any other means except killing. The facts of this case do not bring it at all under article 677 of the Penal Code, which justifies a homicide when the person slain is making an unlawful and violent attack of a character

less than to take life or do serious bodily injury, and the charge should not have been given predicated on said article.

We do not believe there is any merit in the other errors complained of, and we will therefore not discuss them. The exclamations and remarks of those engaged in the difficulty were admissible. They constituted a part of that transaction. They were made dum fervet opus. If the jury did not believe that they were made by those who acted with the appellant, then they would not use them as evidence against appellant. The circumstances and exclamations themselves indicate that they were made by the defendant or those who acted together with him. They were not relations of past events, but were exclamations showing the animus of the parties, and, we believe, admissible in evidence. Evidently, they were not made by either of the Fullers.

The judgment is reversed, and the cause remanded.

*Reversed and remanded.*

HURT, Presiding Judge, absent.