Nathan Buckner v. The State.

No. 4166.   Decided December 2, 1908.

Rehearing Denied March 17, 1909.

**1.—Murder—Continuance.**

Where the application for continuance as set out in the bill of exceptions did not show whether it was the first or a subsequent application, it will be presumed that it was at least a second application; and where it appeared from the record that one of the witnesses was present at the time of the trial and the other witness was out of the State and his testimony had at a former trial was read in evidence, and that the testimony of another absent witness was simply cumulative, there was no error in overruling the motion.

**2.—Same—Charge of Court—Threats.**

Where upon trial for murder the evidence showed communicated threats by the deceased against the defendant, the defendant had the right under the law to act upon such threats, whether in fact the deceased had made them or not; and it was reversible error in the court's charge to require that the jury must affirmatively find that such threats were in fact made by the deceased.

**3.—Same—Insult to Female Relative—Charge of Court.**

Where upon trial for murder there was no evidence of insulting conduct by the deceased toward a female relative of defendant, there was no error in the court's failure to charge thereon; and the bare fact that the deceased shot towards the house of the defendant did not raise this issue.

Appeal from the District Court of Shelby.   Tried below before the Hon. S. W. Blount, Special Judge.

Appeal from a conviction of murder in the first degree; penalty, imprisonment for life in the penitentiary.

The opinion states the case.

*Tom C. Davis, Bryarly & Walker* and *Geo. S. King,* for appellant.—On question of manslaughter and self-defense: Howard v. State, 23 Texas Crim. App., 265; Lara v. State, 48 Texas Crim. Rep., 568, 14 Texas Ct. Rep., 5; Swain v. State, 48 Texas Crim. Rep., 98; Neyland v. State, 13 Texas Crim. App., 536; Alexander v. State, 25 Texas Crim. App., 260. On question of communicated threats: Huddleston v. State, 54 Texas Crim. Rep., 93, 112 S. W. Rep., 64; Watson v. State, 50 Texas Crim. Rep., 171, 16 Texas Ct. Rep., 587; Penton v. State, 53 Texas Crim. Rep., 323, 109 S. W. Rep., 937; Sebastian v. State, 42 Texas Crim. Rep., 84; Thomson v. State, 49 Texas Crim. Rep., 384, 15 Texas Ct. Rep., 436; Gaines v. State, 53 S. W. Rep., 623; Cohen v. State, 53 Texas Crim. Rep., 422, 110 S. W. Rep., 66.

*F. J. McCord,* Assistant Attorney-General, for the State.—Blain v. State, 33 Texas Crim. Rep., 236.

BROOKS, Judge.—This is the second appeal, and second conviction with life imprisonment.

The former opinion will be found in 52 Texas Crim. Rep., 271. The evidence in the case shows that appellant and deceased lived near each other in the country in Shelby County, and for quite a while prior to the homicide there had been between them many quarrels based upon, in some instances, family disputes, and, in some instances, on questions of fence, cattle, and trespassing of one or the other, and on one occasion they came very near having blows. The State's evidence presents the theory that appellant killed deceased without word or warning on account of these previous animosities. Appellant's theory was that he killed deceased in self-defense. He testified to threats having been made against his life by deceased, which threats had been communicated to him. Other witnesses testified to having communicated the threats to appellant. There were two eyewitnesses to the killing outside of the deceased, appellant and his son. Appellant and his son testified substantially to the same facts in reference to the immediate killing, and appellant states the same in the following language:

"When we got through fishing up there I thought it was about 12 o'clock, and we were not catching anything, and I just remarked to my little boy to come on and let's go to the house, we were not going to catch anything, and we turned around. I gave my pole to my little boy, and then stepped back to where I had my gun laying on the roots of this tree, and picked my gun up and started to the house; after I picked my gun up I turned around and started back east towards this ford to the house; we started by the ford because it was the way out to the house; it was the only way we could go that was without putting a pole across the creek at the water gap and walking a pole; I had gone from that magnolia tree to the house before that, and we went from the magnolia tree out by the wash place; it was a plain view out that way and the nearest way to the house. We started from that tree home, and after we turned and started I didn't go but a little ways until I saw Mr. Treadwell riding around behind some dry kilns coming right towards me; there were some dry kilns there at that time; it is my recollection that there were three dry kilns there; the dry kilns were between ten and twelve feet high; they might not have been that high, but they were at least eight feet high; they were planked up from the ground up. I saw Mr. Treadwell riding from around those dry kilns; when I saw him I went right on meeting him, and just as I walked up on the bank of the creek Mr. Treadwell rode right down in the water. I had my gun down in my hand just like I picked it up and walked off with it aiming to go to the house, and didn't go but a few steps until I saw Mr. Treadwell. I did not change the position of my gun when I saw him. Of course, I usually carried my gun on my shoulder, but just a short distance that way I very often will pick up my gun and walk with it just down in my hand; my gun was not cocked;

when I came up on the bank of the creek I was about fifteen feet, I reckon, from Mr. Treadwell, from where he stopped; might probably have been a little further, but I was pretty close to him. Mr. Treadwell was riding; he was riding what I would call a bay horse. When I first saw him he was riding straddle on the horse, and immediately after I saw him and he saw me he threw his right leg over the horse's shoulder and turned sideways on the horse and rode down in the creek a little sideways towards me; his right leg was over the neck of the horse. I walked up on the bank of the creek and said, 'Good-morning, Mr Treadwell.' He never spoke, just dropped his head like and I replied to him, 'Mr. Treadwell, I suppose you said you were going to turn those cattle back in that pasture if you had to kill every one on the place.' About the time I got that out of my mouth he threw his hand back and dropped off of his horse at once; he dropped off on the right side of the horse on the opposite side, on the left side of the horse; the right side of the horse was towards me, the horse's head was up the creek; he dropped off of the horse on the opposite side from me. As he dropped off of his horse he says, 'Look out here, Buckner, God-damn you; don't you come down here on me with that gun.' He never said anything else; never said a word. He then got down under the horse's neck in a doubled-up position and threw his hand from under his horse's neck with his pistol in his hand as though he was going to shoot me, and I shot him at once; his pistol was in his right hand; his body was back sorter behind the horse's shoulder with his right hand under the horse's neck like; his right hand up in a raised position when I shot; he had a pistol in his right hand; I know he had a pistol in his right hand simply because I saw it; the pistol was pointing right at me and I shot him immediately; his horse's neck and head were up the creek at the time I shot him; he was right down by his horse's shoulder along in under the horse's neck like when I shot him. When I fired the first shot the horse wheeled over at once and I fired again. I couldn't tell to save my life what position he was in when I fired the second shot. I fired the second time because I didn't know whether I hit him or not, and I didn't know but what he should shoot me still. I fired the first time because I thought he was going to shoot me. I thought he was going to shoot me because he had his pistol drawn. I had heard previous to that that he said he intended to kill me. When I fired the first shot I could see part of Mr. Treadwell's bowels and his hand and arm; that was the part of him I shot at; I shot at him right there."

The second ground of the motion complains that the court erred in overruling appellant's application for continuance for the want of the testimony of Jack Anderson and wife, and Porter Davis.

The bill of exceptions does not show whether it is the first, second or third application, and in the absence of any statement to the contrary we will presume it is at least the second application. Appended to the bill is this qualification: "The witness Jack Anderson was present and testified, and the witness Porter Davis was shown to be out of the State, and his testimony had at a former trial of the case was read to the jury as his evidence in the case, and it further appeared that the testimony of Mrs. Anderson was not material." Being a second application, if material, it clearly was cumulative of that of the children who were with her and appellant's wife at the time the circumstances expected to be proved by her occurred, and, therefore, her testimony under any theory was cumulative. The court, therefore, did not err in overruling the application for continuance.

The third ground of the motion insists that the court erred in his charge to the jury in stating the effect of threats made by deceased, Treadwell, against the life of appellant, because the appellant, under the law, would have the right to act upon communicated threats, whether in fact deceased had made them or not. Second, it is not necessary in order to justify a defendant in acting upon communicated threats that the threats in fact have been made. If appellant had been told that the deceased had threatened to take his life and intended to shoot him, he would have the right to act upon such information, if he believed the same to be true, whether in fact the deceased had made them or not. Third, the court erred in his written charge to the jury qualifying the right of the defendant to act upon communicated threats, upon the proposition that before he could act upon such threats communicated to him, that the jury must find affirmatively that the threats were in fact made by the deceased. That this was material error and prejudicial to the rights of the defendant, because John Buckner testified that he told the defendant on Monday before the killing that Jack Anderson had told him that he heard the deceased threatened to take the life of the defendant, and that he intended to do it; and the court permitted the reputation of Jack Anderson for truth and veracity to be impeached by the State, and then in his written charge to the jury, told the jury that before they could consider the threats, which Anderson had testified the deceased had made and which John Buckner had communicated to the defendant, that they must believe from the evidence that the deceased had in fact made the threats to Anderson. That this was material error and prejudicial to the rights of defendant to act upon communicated threats, viewing the matter from his standpoint. The charge complained of is as follows: "When a defendant seeks to justify a killing upon the ground of threats against his own life he is permitted to introduce evidence of such threats whether they were communicated to him before the killing or not, but such threat, if made, would not be

regarded as affording a justification for the killing unless it be shown that at the time the person killed by some act then done by him, manifested an intention to execute the threats so made. And if you believe the deceased had made such threats against defendant and at the time of the killing did any act manifesting an intention then to execute such threats, or did some act which was reasonably calculated in view of all the circumstances to produce in the mind of the defendant the belief that deceased was then about to execute the threat, the killing would be in self-defense. And if you so believe the facts to be, or if you have a reasonable doubt as to whether or not such is the truth of the case you will acquit the defendant." In the case of Bryant v. State, 47 S. W. Rep., 373, this court had under consideration a similar charge, and in passing on the question, used the following language: "The court gave appellant the full benefit of a charge on the appearance of danger, which was all he was entitled to in that connection. The charge on self-defense sufficiently covered all of the evidence relating to what had passed between the parties previous to the homicide, including threats; and the fact that the court gave a charge on threats in the following language, to wit: 'Threats made by the deceased against the life of the defendant are not to be regarded as affording justification for the killing, unless at the time of the homicide the person killed, by some act then and there done, manifested an intention to execute the threats,' was, in connection with the general charge on self-defense, sufficient." So we have in this case the court charging in every possible way on actual and apparent danger. The court, in its general charge, among other things, charged as follows: "If you believe from the evidence that defendant with a gun shot James H. Treadwell and thereby killed him, but also believe that the killing took place under circumstances from which it reasonably appeared to the defendant, as viewed from his standpoint, by the acts or by words coupled with the acts of Treadwell that it was the purpose and intent of Treadwell unlawfully to shoot the defendant with a pistol or otherwise to inflict upon him death or some serious bodily injury, and that the killing took place while Treadwell was, or reasonably appeared to be, in the act of inflicting such death or injury upon defendant, or after some act done by him, showing evidently as it reasonably appeared to defendant from his standpoint, that it was his intent and purpose to inflict such death or injury upon defendant; or if from the evidence you have a reasonable doubt as to whether or not such is the truth of the case you will find the defendant not guilty."

Furthermore, "You are further instructed as a part of the law of self-defense that it is not essential to the right of self-defense that the danger should in fact exist; if to defendant it reasonably appeared that the danger in fact existed he had the right to defend against it to the same extent and under the same rules which would

obtain in case the danger had been real. The defendant may always act upon reasonable appearances of danger, and whether the danger is apparent or not is always to be determined from the standpoint from which the defendant viewed it at the time he acted."

Again, "If defendant, having his gun, met with deceased, and deceased by some act then done by him or by his words coupled with his acts made the first hostile and threatening demonstration, then defendant had the right to stand and act on his right of self-defense as hereinbefore explained to you unimpaired by the fact that he had a gun." It is a rudimentary principle of law in this State that the charge must be taken as a whole, and when this charge is measured by this rule, it can not seriously be contended that the charge complained of is error. It is certainly true that defendant had a right to act upon the threats whether they had actually been made or not, and while the charge complained of might appear to put a limitation upon this proposition, yet when it is considered in the light of the excerpts from same above quoted, it clearly shows that the court in fact amplified upon both real and apparent danger to defendant by the threats he relied upon as a defense. The truth of the matter is, there was no manslaughter in this case under the evidence of defendant and his son. It was either self-defense or murder in the first degree. The jury have seen fit to believe the State's theory of the evidence, but the court, through extra caution, charged the jury on manslaughter, presenting every phase, as stated, of real and apparent danger. The case cited above, as stated, is decisive of this question. In addition thereto, we will add that under article 723 of the Code of Criminal Procedure, we are not authorized to reverse a case unless the error complained of was calculated to injure the rights of appellant. The evidence in this case clearly shows, and the uncontradicted testimony demonstrates, that deceased rode down to the edge of the water, having on no coat, to water his horse after plowing during the morning. Appellant accosted him in a manner that was not calculated, to say the least of it, to bring about a harmonious settlement of anything. He says deceased rolled off of his horse and stooped under the neck of the horse and was in the act of shooting when he killed him. No pistol was found near the deceased. Now, can it be seriously contended, in the light of this character of record, that a bare omission of the statement on the charge of threats, that the jury must look at the facts from defendant's standpoint, and that defendant had a right to act on the threats whether they were actually made or not, could possibly have injured appellant? We say no. This statement, as above suggested, was rendered doubly impossible by the other portions of the charge that it told the jury that they must look at all the facts from defendant's standpoint, and that he had a right to act upon the appearances of danger as they occurred to him, and could kill the deceased whether the danger was real or apparent. It follows,

therefore, there is no error in this charge to authorize a reversal of this case.

The last ground of the motion complains that the court erred in failing to charge on the theory of manslaughter suggested by insulting conduct by deceased towards a female relative of defendant. There is nothing in this record suggesting any insult to a female relative within the contemplation of the manslaughter statute. The bare fact that deceased shot towards the house is not an insult, even conceding that he intentionally shot towards the house. It might be an assault upon the wife, but it is not an insult to her. Instead of forming a basis for a charge on that matter, it would simply be a predicate for additional malice on the part of appellant.

We have carefully examined this record in all of its details. As stated above, the appellant had been twice convicted of murder in the first degree with life imprisonment, and there is nothing in this record that suggests there was any possible error in the verdict of the jury or the trial court.

*Affirmed.*

ON REHEARING.

March 17, 1909.

BROOKS, JUDGE.—This case comes before us on motion for rehearing, appellant insisting that this court was in error in holding that the trial court did not err in his charge to the jury, on the effect of threats made by Treadwell against the life of the defendant, because, first, the defendant under the law would have the right to act upon communicated threats, whether in fact the deceased had made them or not. Second, it is not necessary in order to justify a defendant in acting upon communicated threats, that the threats have in fact been made. If the defendant had been told that the deceased had threatened to take his life and intended to shoot him he would have the right to act upon such information, if he believed the same to be true, whether in fact the deceased had made them or not. Third, the court in his written charge to the jury qualified the right of the defendant to act upon communicated threats, upon the proposition that before he could act upon such threats communicated to him, that the jury must find affirmatively that the threats were in fact made by the deceased. This was material error and prejudicial to the rights of the defendant, because John Buckner testified that he told the defendant on Monday, before the killing, that Jack Anderson had told him that he heard the deceased threaten to take the life of the defendant and that he intended to do it, and the court permitted the reputation of Jack Anderson for truth and veracity to be impeached by the State, and then in his written charge to the jury told the jury that before they could consider the threats, which Anderson had testified the deceased had made and which John

Buckner has communicated to the defendant that the jury must believe from the evidence that the deceased had in fact made the threats to Anderson. This was material error and prejudicial to the rights of the defendant to act upon communicated threats viewing the matter from his standpoint, the law being that the defendant would have the right to act upon communicated threats whether the jury believed in fact the threats had been made or not. The defendant's right to act, viewing the matter from his standpoint was not dependent upon whether Jack Anderson had told the truth or had told a falsehood about what he had said as to Treadwell having told Anderson, but was dependent alone upon the defendant's belief that Treadwell had threatened him. After a careful review of the original opinion and the authorities cited in connection with other authorities, we believe this court was in error in holding that the charges on threats was not erroneous and harmful. The doctrine of threats is a statutory doctrine that must be given by the court, although the court should subsequently or prior thereto charge upon the doctrine of real and apparent danger. In other words, the law of threats is a substantive defense matter that should be presented wherever the doctrine of threats is proven in the trial of a case, and the law of this State is, it is immaterial whether the threats were in fact made or communicated, that they become pertinent testimony in the trial of a case upon which the court must give the law pertaining thereto. In this case the appellant relied upon threats purported to have been communicated to him. It was controverted by the State in the way of impeachment of appellant's witnesses and otherwise as to whether or not the threats in fact were actually made. The charge of the court tells the jury in substance that, if they believe deceased had made such threats against defendant, and at the time of the killing did any act manifesting an intention then to execute such threats, or did some act which was reasonably calculated in view of all the circumstances to produce in the mind of the defendant the belief that deceased was then about to execute the threat, the killing would be in self-defense; and if they so believe the facts to be, or if they have a reasonable doubt as to whether or not such is the truth of the case, they will acquit the defendant. This eliminates, as appellant insists, the question that the jury must pass on, to wit, the mental status of the defendant. Whether threats had been made or not, if defendant believed they had been made, and so believing acted upon said threats, then the law would justify him in so acting. The charge is clearly defective along this line. It is immaterial what the jury believed about the threats, but the charge should clearly inform them that if they believed the defendant thought the threats had been made, and so believing acted upon same, etc., then they will acquit the defendant. See Huddleson v. State, 54 Texas Crim. Rep., 93, 112 S. W., 64; Lockhart v. State, 53 Texas Crim. Rep., 589, 111 S. W. Rep., 1024; Watson v.

State, 50 Texas Crim. Rep., 171, 16 Texas Ct. Rep., 589; Cohen v. State, 110 S. W., 68, and various other authorities that might be noted. It follows, therefore, that we were in error in the original opinion in holding that the error of the court below on the question of threats was not sufficiently erroneous to require a reversal of this case.

The motion for rehearing is granted, the former conviction is set aside, and the judgment is reversed and the cause remanded.

*Reversed and remanded.*