### SIMON B. HUDSON v. THE STATE.

#### No. 157. Decided June 15, 1910.

**1.—Murder—Charge of Court—Deadly Weapon.**

Where, upon trial of murder, the evidence showed that the deceased attacked the defendant with a pocket-knife which was capable of producing death, the court should have charged article 676, Penal Code, with reference to the presumed intent of the deceased, and the failure to do so was reversible error. See opinion for definition of deadly weapon under this issue.

**2.—Same—Charge of Court—Threats—Harmless Error.**

Where, upon trial of murder, there was no issue as to whether the alleged threats had been uttered, there was no reversible error in the court's charge leaving to the jury to determine whether deceased had uttered these threats, although such charge should not have been submitted.

**3.—Same—Charge of Court—Apparent Danger.**

Where, upon trial of murder, the court distinctly told the jury that it was not necessary that there should be actual danger, an objection that defendant was deprived of a charge on apparent danger was untenable.

**4.—Same—Charge of Court—Actual Attack.**

Where, upon trial of murder, the court's charge was not subject to the objection that it confined defendant's defense to an actual attack, there was no error.

**5.—Same—Charge of Court—Threats—Charge as a Whole.**

Where, upon trial of murder, the charge of the court upon threats, considered as a whole, directly applied the law of threats to the facts in his charge on self-defense, there was no reversible error.

Appeal from the District Court of Hill. Tried below before the Honorable W. C. Wear.

Appeal from a conviction of murder in the second degree; penalty seven years imprisonment in the penitentiary.

The opinion states the case.

*Morrow & Smithdeal* and *V. L. Shurtleff,* for appellant.—On question of court's failure to charge Article 676, Penal Code; Pierce v. State, 21 Texas Crim. App., 540; Ward v. State, 30 Texas Crim. App., 687; Kouns v. State, 3 Texas Crim. App., 13; McReynolds v.

State, 4 Texas Crim. App., 327; Briggs v. State, 6 Texas Crim. App., 144; Hardie v. State, 36 Texas Crim. Rep., 401, and cases cited in the opinion.

*John A. Mobley,* Assistant Attorney-General, and *J. W. Marshall,* Assistant County Attorney, and *A. M. Frazier,* County Attorney, for the State.—On question of court's failure to charge Article 676 on deadly weapons: Yardley v. State, 50 Texas Crim. Rep., 644; 100 S. W. Rep., 399; Hatton v. State, 31 Texas Crim. Rep., 586; Renow v. State, 56 Texas Crim. Rep., 343; 120 S. W. Rep., 174.

RAMSEY, JUDGE.—Appellant was convicted in the District Court of Hill County, Texas, on the 8th day of February of this year of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of seven years. On appeal to this court he presents a number of interesting questions on which a reversal is sought. Many of these cannot arise on another trial, and need not, therefore, be noticed. The parties all lived in or near the little town of Aquilla, in Hill County. We gather from the testimony that there had been a wager between the parties, in substance, as to whether appellant's watch was nearer the correct time, as determined by the railroad clock, than that of deceased, in which deceased claimed to have won $5 from appellant. The testimony of the State tends strongly to suggest that appellant was the aggressor and that the killing was substantially unprovoked. The testimony, however, of appellant, introduced through his son-in-law White, is more favorable towards him. The testimony was further that a very few minutes after deceased was found, a knife was found by his side close to his right hand. This knife was described as being four or five inches long, and as a double-blade, horn-handle knife. The large blade was shown to have been open. Dr. Roberts, introduced by the State, says that the blade of the knife was some three to three and a half inches long. It is shown further that deceased was about thirty-two or thirty-three years old and would weigh 170 to 175 pounds, and was a robust, healthy and strong man. Later in his testimony, after having measured the knife produced, which seems to have been conceded as the knife in question, he stated that the blade of same was two and a half inches long, and on cross-examination, said: "In saying that I regarded the knife as one that would kill a man I had reference to the knife that I saw there whether it was two and one-half or three and one-half inches long—that it was a knife that would kill a man." The facts of the case insofar as necessary to this opinion may be fairly summarized by a reproduction of the testimony of the witnesses Perkins and White. On cross-examination Perkins gave the following testimony: "They were on the south side of the ditch about even with the west end of the gallery when Hudson caught him. Hudson caught Taylor by the left arm and whirled him

around east. When Hudson caught Taylor he was on the north side of him straight behind him. He reached out and caught him by the left arm and whirled him around. He whirled him around and Taylor said, "Go away, Simon. Leave me alone. I am not bothering you." He jerked aloose from him. They stood facing each other while standing there but a second. He jerked aloose. Taylor jerked aloose and went on east three or four steps and then turned; and when Taylor turned Hudson said, "Taylor, don't come on me with that knife" and immediately the shots were fired. After Taylor broke aloose from Hudson and turned, Hudson was standing still. I don't know whether or not he was facing due south. I was looking at both of them. My best recollection is that Hudson was facing southeast. He was not exactly looking in the direction of Hill's hotel nor in the direction of the barber shop, but was facing some like southeast. Taylor turned and wheeled around after he walked three or four steps. He wheeled around suddenly and Hudson then said, "Taylor, don't come on to me with that knife," and shot right then after the statement. Taylor did not stop after Hudson told him not to come on with that knife. He wheeled around and just as soon as he wheeled around Hudson said, "Don't come on me with that knife." Hudson said that just as soon as he wheeled around and just as soon as he said it the shot was fired. Hudson spoke in a pretty loud voice. I did not hear Hudson say, "Don't come on me with that knife" but once. My hearing is tolerably good and so far as I know I can hear as well as anybody. I heard what I did hear between Taylor and Hudson. There might have been something said that I did not hear. Milt White was closer to them than I. I don't know how close was Ed Arnold. I saw him out there. I heard what I did hear. I don't know any reason why I should not have heard everything that was said between them. When Simon said, "Don't come on to me with that knife," he said it in a pretty loud voice, and once is all I heard him say it. The shot fired and Taylor fell and said, "Oh!" and that is all I heard. I reckon I was about eight or nine or ten feet from Taylor when he fell; I was not much difference in distance from the two men." This witness, however, stated positively that he was close to the parties and he did not see any knife, and at the time the shot was fired both of appellant's hands were hanging by his side. Arnold gave the following account of the killing: "I was in the restaurant there and I heard a racket out in front and went out to the front and it was across the street from where I was and I walked over across the street and Mr. Taylor and Mr. Hudson were standing there. The first thing that I remember hearing was Mr. Hudson say, he seemed to be talking to Mr. Taylor, he said, "You are a God damn shit," something to that effect. I don't remember hearing Taylor say anything in reply to that. The next thing I heard, Simon said, "Take your hands out of your pockets"—the next thing I remember. I

could only see one side of Taylor. He had his right side to me. When Hudson told him that, he pulled his right hand out of his pocket. The next thing Taylor turned around and stepped across a little ditch that was there running right along in front of the gallery where they were standing. That little ditch ran east and west. My restaurant is situated southwest from that gallery where they were on the opposite side of the street from the gallery, on the south side of the street. When I first saw Mr. Hudson he was standing on the gallery near about the center of the gallery, and Mr. Taylor was standing with one foot on the step of the gallery and the other on the sidewalk, on the west side of the gallery, the west end between the real estate office and post office. He was some lower than Mr. Hudson. That ditch runs east and west on the north side of the street, along in front of the real estate gallery. That ditch began right close to the edge of the real estate gallery, not over two or three feet, something like that. That ditch seemed to be something like a step wide. It had some water or mud in it along by that gallery. I don't remember whether or not there was any place there where the people crossed that ditch more than they did at any place in the vicinity of the gallery. I don't remember whether or not there was any place there along that ditch where it could be more easily crossed than it could at other places. After Taylor took his hand out of his pocket, then Taylor stepped down off the sidewalk across the ditch and was going south at that time, and at that time Hudson walked down and walked across, too, in the same direction that Taylor walked. Hudson stepped off the west end of that gallery at about the same place where Taylor had been previously standing and crossed the ditch, and it seems, to the best of my knowledge, that Hudson crossed the ditch a little farther down west than Taylor. It could not have been over three or four feet between the places where Taylor and Hudson crossed that ditch. After Hudson crossed that ditch he caught up with Taylor and laid his hands on Taylor's arms and said, 'Hold on! I am not through with you yet.' Taylor kind of turned around and pulled loose from Hudson and said, 'Go on, Simon, and let me alone'—something like that. I don't know whether or not that is the exact words. Taylor started east then. The best I remember Hudson stopped. I don't remember of him going any direction from there. The next thing I remember was hearing the report of the pistol and I saw Taylor fall. It seems to me that Taylor was something like three steps from Hudson when Hudson shot." This testimony was not substantially shaken on cross-examination. Milt White, who is a stepson of appellant, testified that appellant came to the restaurant where he was working a few minutes before the homicide and that they had started home and went by a store across the street to get some tobacco. He then gives this account of the killing: "We started angling across the street like

this. After we got across the street I saw Mr. Luther Taylor, and conversation took place between him and Mr. Hudson. At the time the conversation had begun, Luther Taylor was sitting on a rock in front of the real estate office gallery and I and Mr. Hudson was east of Mr. Taylor fixing to step upon the gallery. We were four or five feet east of Taylor, I reckon, might have been a little farther or not quite so far. Mr. Taylor began the conversation. He asked Mr. Hudson what he was going to do about that $5, and Hudson said that he did not know that he was going to do anything. Hudson stopped and at the time he stopped he was east of Taylor and then Mr. Taylor got up. He stepped around the corner of the gallery right up to the side of this little walk right here, around the corner of the gallery, and stepped up by the side of the walk but did not get upon the walk. That was all he did. Mr. Taylor said, 'I won $5 off of you, and God-damn it, I am going to have it.' Hudson told him to take his hands out of his pocket and Taylor said he would take them out when he God-damn got ready. (Referring to map.) Here is a ditch. There is a ditch running by the side of the walk. Mr. Hudson stepped across the ditch right here and he stepped across the ditch like that. He stepped east behind Mr. Hudson, crossed his trail. He was going towards the barbershop and Hudson was coming towards the restaurant and he went out in the street a piece and Hudson said, 'You acted a damn shit,' and Taylor said, 'You are a God-damn liar,' and turned around and stepped one or two steps towards him and the gun fired. That is all I heard before the killing. Hudson said, 'Don't come on me with no knife, or don't cut me with no knife; don't come on me with no knife.' That was said by Hudson just before the gun fired. At that time Taylor had started towards Mr. Hudson." The testimony of this witness was contradicted in many respects, but the weight of it was for the jury.

1. In this state of the evidence it is urged that the court erred in not charging the jury the substance of article 676 of the Penal Code. This article is as follows: "When the homicide takes place to prevent murder, maiming, disfiguring or castration, if the weapons or means used by the party attempting or committing such murder, maiming, disfiguring or castration are such as would have been calculated to produce that result, it is to be presumed that the person so using them designed to inflict the injury." This contention is strongly combatted by the State for the reason, among others, that there was no direct or positive evidence in the record that the deceased was armed with a deadly weapon at the time, or that he was making any assault upon the accused or attempting so to do; and further, that the record shows that appellant provoked the difficulty, and by reason of this fact was cut off from his claim of self-defense. It is significant that the court did not charge the law of provoking the difficulty or imperfect self-defense. In Duke v.

State, 56 Texas Crim. Rep., 502, 120 S. W. Rep., 894, such a charge
was held demanded where the evidence was much slighter and less
cogent than that here produced and it was said: "When the ac-
cused introduces evidence suggesting or raising an issue favorable
to his side, the law applicable to that testimony should be given
in charge to the jury. It is not the province of the court to settle
the veracity of witnesses or weight of testimony in giving or refus-
ing charges or omitting to charge." It seems clear to us that the
same evidence which raised the issue of self-defense both in respect
to an actual attack and one threatened, as certainly raised the issue
of an assault with a knife. The description of the knife taken in
connection with the testimony, uncontradicted, of the physician that
it was capable of producing death, demanded that such a charge
should be given. The knife here charged to have been used, in view
of the uncontradicted testimony that it was a deadly weapon, brings
the case clearly within the rule laid down in Pierce v. State, 21
Texas Crim. App., 540, and Ward v. State, 30 Texas Crim. App.,
687. The case is clearly distinguishable in its facts from the deci-
sion in Renow v. State, 56 Texas Crim. Rep., 343, 120 S. W. Rep.,
174. In the case of Briggs v. State, 6 Texas Crim. App., 144, a
knife described as having a blade three inches long was held to be
a deadly weapon, and this, too, in the absence of any direct evidence
that same was a deadly weapon. Instruments such as this have, in
the reported cases of the evidence adduced, been held to be deadly
weapons. In the case of Scott v. State, 42 Texas Crim. Rep., 607,
62 S. W. Rep., 419, a razor was held to be a deadly weapon, and in
the case of Walters v. State, 37 Texas Crim. Rep., 388, 35 S. W.
Rep., 652, a pocketknife without proof as to its size was held to
be a deadly weapon. We do not think that this statute applies in
respect to every weapon used which might cause or which is capable,
under some conditions, of causing death. Death might be produced
where the weapon is applied to a vital spot by almost any instru-
ment, as a small stick, a penknife, or even the most delicate weapon.
We think, perhaps, the most intelligent and comprehensive definition
of a deadly weapon is that given in the case of Acers, 164 U. S.,
388, 41 Law. Ed., 844, which is as follows: "A weapon by which
death may readily and easily be produced; anything, no matter
what it is, whether it be made for the purpose of destroying animal
life, or whether it is made by man at all, or whether it is made by
him for some other purpose, if it is a weapon; if it is a thing by
which a death can be easily and readily produced, the law recognizes
it as a deadly weapon." Applying this definition to the facts of
this case, we have a knife, the blade of which is two and one-half
or three inches long, not shown to be in any respect bent or in-
jured, in the hands of a stalwart man. That such weapon could
easily and would naturally produce death can not be a matter of
doubt, and as was shown in this case by the undisputed evidence

to be a deadly weapon. On another trial the substance of this article should be given in charge to the jury.

2. Complaint is made of the charge of the court on the subject of self-defense and in its application of the law of threats in connection therewith. On this subject the court instructed the jury as follows: "You are further instructed that a reasonable apprehension of death or serious bodily harm will excuse a party in using all necessary means to protect his life or person and it is not necessary that there should be actual danger, provided he acted upon a reasonable apprehension of danger as it appeared to him from his standpoint at the time and in such case the party acting under such real or apparent danger is in no event bound to retreat in order to avoid the necessity of killing his assailant. If, therefore, from the evidence you believe the defendant killed the said Luther Taylor, but further believe that at the time of so doing the deceased had made an unlawful attack upon him which, from the manner and character of the attack, caused the defendant to have a reasonable expectation or fear of death or serious bodily injury, or whether you believe an attack was actually made upon the defendant or not, if from the words, acts and conduct, or either, of the deceased, he caused the defendant to have a reasonable expectation or fear of death or serious bodily injury, and that acting under such reasonable expectation or fear the defendant killed the deceased, or if you have a reasonable doubt as to said matters then you should acquit him and so say by your verdict.

"When a defendant is accused of and is on trial for murder and seeks to justify himself on the ground of threats against his own life the law permits him to introduce evidence of threats made, but also provides that the same shall not be regarded as affording a justification for the offense unless it be shown that at the time of the homicide the person killed by some act then done manifested an intention to execute the threat so made. As to whether the defendant had reasonable grounds to fear an attack by the deceased or reasonable grounds to fear that he was in danger of death or of suffering serious bodily harm or of fearing or believing that the deceased was about to execute a threat involving as a possible result the infliction of death or of serious bodily harm, the facts and circumstances attending the difficulty and the situation of the parties must be looked at and the question determined from the standpoint of the defendant alone.

"In this connection you are charged that if you believe from the evidence that the deceased, Luther Taylor, had made threats against the life of the defendant or had threatened to do him serious bodily harm, and as to whether he had done so is a question for you to determine, and that said threats had been communicated to the defendant and at the time of the difficulty which resulted in the killing of the said Luther Taylor, and at the time the pistol was

fired by the defendant the said Luther Taylor by his acts, or by his words accompanying his acts, or both, manifested an intent to put the threats so made and communicated to the defendant into execution, and that the defendant believed, or had reason to believe, that the deceased was about to put said threats into execution, or if you have a reasonable doubt as to said matters, then you will acquit the defendant." It is complained, first, that the portion of the charge which instructs the jury that it was to determine whether deceased had uttered the threats, was erroneous, because if such threats had been communicated to him, he was entitled to the benefit thereof without reference to whether they had in fact been uttered. If an issue had been made as was done in the case of Buckner v. State, 55 Texas Crim. Rep., 511, 117 S. W., 805, as to the making of the threats, this objection would be serious, but in the light of the record, as here presented, we would not on this account reverse the case, though we suggest upon another trial that this paragraph of the court's charge be eliminated. It is complained further that the charge of the court deprived appellant of the benefit of the law of apparent danger. This criticism is not justified by the charge. The court distinctly told the jury that it was not necessary that there should be actual danger, provided appellant acted upon a reasonable apprehension of danger as it appeared to him from his standpoint at the time. Nor is the charge subject to the objection that it confined appellant's defense to an actual unlawful attack. The court in terms instructed the jury that if they believed, or had a reasonable doubt as to whether an attack was actually made or not, if from the words, acts and conduct or either of the deceased, he caused appellant to have a reasonable expectation or fear of death or serious bodily injury, and that acting under such reasonable expectation or fear, he killed the deceased, they should acquit. Complaint is made that in the charge on threats the court did not instruct the jury in terms that in acting with reference to the threats, appellant should do so with reference to conditions as they appeared to him at the time and on this question we are referred to the case of Gonzales v. State, 28 Texas Crim. App., 130. Considering the charge of the court all together, it is not subject to the objection pointed out in the Gonzales case, supra, for the jury are in terms instructed that in passing on the question and issue as to whether appellant had reasonable grounds to fear an attack by deceased or to fear that he was in danger of death or of suffering serious bodily harm, or of fearing or believing that the deceased was about to execute a threat involving, as a possible result, the infliction of death, or serious bodily harm, the facts and circumstances attending the difficulty and the situation of the parties, must be looked at and the question determined from the standpoint of the defendant alone. This, we think, was a proper submission of this issue. There

are numerous complaints of this charge because in isolated paragraphs of same all of the defensive matters are not included therein. It can not be too often pointed out and stated that charges, as other instruments, must be considered all together and their accuracy and sufficiency tested as a whole. In a case such as this it would be perhaps impossible, certainly very difficult, in every paragraph of the charge to include the submission of every phase of all the issues raised in the testimony in such a way as not to be confusing. Where in a connected and intelligent manner the issues are submitted in succeeding paragraphs, properly limited, and constituting all together an intelligent and fair submission of the issues, this is sufficient.

The other questions arising in the case, receiving the verdict, references to appellant's failure to testify, and matters of that sort will not likely arise on another trial and need not be discussed. For the error pointed out the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Davidson, Presiding Judge, and Thomas B. Love, Special Judge, concurring.