## JOHN CASNER v. THE STATE.

### No. 1958.   Decided June 13, 1900.

**1. Murder—Intent of Deceased—Charge.**

On a trial for murder the following among other instructions was given by the court to the jury, viz: "And if from the facts and circumstances in evidence before you in this case, viewed from deceased's (Pitner's) standpoint, that at the time of the killing deceased had reason to believe and did believe, from words spoken or acts done by defendant and his son, or either of them, that they or either of them intended to immediately take his life or do him serious bodily injury, then deceased had the right to defend himself and fire the first shot, although you may believe that he was in fact in no actual danger." Held the charge was erroneous in that it restricts the rights of defendant to the intent of deceased. This can not be done. Defendant's intent must be judged from his own purpose and not by the intent of deceased. Defendant can not be held responsible for what deceased believed his, defendant's, intent to be and not what it actually was.

**2. Same—Evidence—Declarations of Coconspirator—Charge Limiting and Restricting.**

On a trial for murder committed by defendant and his son on account of deceased putting up a fence defendant had pulled down, declarations of the son made before the killing and when defendant was not present, to the effect that he had planted five men and would plant deceased if he put up the fence, while admissible as evidence under the facts of the case, should nevertheless have been limited by the charge, and the jury should have been instructed to disregard it unless they found that the son and defendant had conspired together to kill deceased.

**3. Same—Self-Defense—Resort to Other Means—Charge.**

It is not the law of this State that "all other means must be resorted to" where defendant justifies a killing on the ground of self-defense in order to prevent injury to his person. Where serious bodily injury is threatened, the party so threatened has the right to use whatever means were reasonably necessary to protect himself, and he may act upon danger or reasonable appearance of danger. Upon such a state of case it is error to instruct the jury that defendant could not justify unless he had resorted to all other means before killing.

APPEAL from the District Court of Fisher, on change of venue from Haskell County. Tried below before Hon. P. D. SANDERS.

Appeal from a conviction of murder in the first degree; penalty, imprisonment for life in the penitentiary.

Appellant was charged by the indictment with the murder of Tom Pitner, on the 16th day of September, 1899, by shooting him with a pistol and gun. The record is very voluminous, but the material facts in evidence are sufficiently stated in the opinion.

*Dalton & Britain*, for appellant.

*Rob't A. John*, Assistant Attorney-General, for the State.

BROOKS, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at confinement in the penitentiary for life. The homicide occurred in Haskell County, but the venue was changed to Fisher County. In order to properly understand the charge of the court, and the objections made by appellant to the introduction

of evidence, we will make a brief statement of its salient features:
Appellant and his son Lou Casner owned the tract of land adjoining
the tract owned by deceased. Deceased's (Pitner's) tract and appel-
lant's tract were immediately west of the tract known as the "Blount
Pasture." Appellant had leased the Blount pasture, and, as a part of
the lease contract, he had ꞌagreed to remove the west string of the
Blount pasture fence, which formed part of the inclosure around de-
ceased's land, which fence was upon deceased's land. Appellant knocked
the wire off the posts, leaving it on the ground by the side of the posts.
Appellant had frequently threatened to kill deceased if deceased.nailed
the wire back on the posts; and appellant's son had stated that he had
planted several men, and would plant deceased if deceased persisted in
his intent to rebuild the fence. Outside of the participants, there was
but one eyewitness to the killing, Kit Parker, who testified, in substance:
That deceased, Pitner, came to him about 2 o'clock on the evening of
September 5, 1899, and asked witness to go with him to help fix the
fence, which the witness did, after some persuasion; telling deceased
that he would get into trouble if he attempted to fix it. Deceased had
a Winchester shotgun and a six-shooter. He was driving a two-horse
wagon, and leading a saddle horse. They went to the place where the
fence was down, and stopped about 200 yards north of the southeast
corner of the Welch place, owned by deceased. Deceased began fixing
the fence. After awhile witness saw appellant and Lou Casner, his son,
coming from the south, from appellant's home, and informed deceased
of their coming; and deceased caught hold of the bridle reins of the
horses, and attempted to turn the wagon crosswise between him and
appellant and Lou Casner. Deceased then asked him to get out and
unhitch the horses from the wagon, and then asked witness to go and
tell appellant and his son what he said. "He told me to tell that
'Scott had told him to fix up the fence, and, if they wanted to talk to me,
to leave their guns down there, and I will talk to them.'" Witness met
appellant and his son, and commenced to tell them what deceased said,
and they did not seem to notice witness, only Lou asked witness what
part he was playing. Witness did not recollect just what he said, but
thinks he said he was simply looking on, whereupon appellant told wit-
ness that, if he did not want to get hurt, he had better stay down there.
Appellant and son walked up within about seventy-five yards of where
deceased was, and appellant got over on the west side of the fence, and
was walking in a northwest course. His son got down on his knee and
leveled his gun towards deceased, and hallooed for deceased to get out
from behind the wagon. The son then got up and ran behind some
mesquite trees, a short distance. Just before he got behind the trees,
deceased fired at him. Then he fired at deceased. About that time
appellant fired at deceased, also. He was about forty yards southwest
from deceased. Appellant shot at deceased three times. Deceased turned
around to shoot at appellant, but did not shoot. He turned back and
shot at Lou. Then deceased turned and shot at appellant. During this

time Lou Casner was still shooting. About the time deceased shot at appellant, he dropped his gun and fell. Appellant and son both stopped and loaded their guns. Deceased got up, holding the muzzle of his gun, and started running west. He carried his gun about twenty-five yards and dropped it. He ran about fifty or seventy-five yards. About that time Lou Casner fired another shot at deceased, and deceased fell. Then both appellant and son walked south, towards their house. As soon as they got out of sight, witness went to deceased and assisted him in the wagon, and carried him to John King's house, where he subsequently died. In this connection the State introduced the following letter, which was written September 4, 1899, and received by defendant on September 6, 1899: "Mr. John Casner, Ample, Tex.—Dear Sir: Tom Pitner makes complaint to us that you have torn down the part of west string of Blount fence, which he joins, thereby leaving his crop exposed so that the stock are destroying his crops. We do not think it is best for you to do this, and would prefer that you let the fence stand until such time as you can withdraw it within Blount's line, and at once put it up as called for in your contract. Of course, we understand what time the contract gives you to do this. The law does not allow one party to separate his fence from that of another person without giving six months notice. To do so is a finable offense. Then, again, the fence now stands on Pitner's land, and we can not consent to its being so used as to harass and injure him, as he might get mad at us, and cause us trouble about taking the fence off his land. It is better that you let the fence stay up until you move it back inside of Blount's lines, and we request that you do this. Respectfully yours, Foster & Scott." The testimony shows that Foster & Scott were the attorneys and agents of the owner of the land, and as such had rented the land to appellant. The State also proved by C. K. Jones that, after appellant was arrested and carried to Haskell, he heard appellant make this statement: "I heard defendant say that when Tom Pitner squatted down in some grass, weeds, or something, that he [defendant] thought Pitner was possuming, and told Lou Casner that he had better go and finish the damned son of a bitch, and that he [defendant] had nothing to shoot with." This statement had reference to the time and place of the killing of Tom Pitner. By the witness Otis Parker the State proved that appellant sent his sons Frank and Lou Casner up on the windmill, to see if Tom Pitner was fixing the fence, and said that they were going to make him quit putting up the fence, or kill him. Appellant and son Lou both made the remark. Appellant testified in his own behalf that: He took the wire off the posts, leaving the same by the side of the posts, on the ground. "We [meaning himself and son] were just ready to go to work to move the Blount fence, under the contract, and Lou was grinding his ax for that purpose, when this thing come up. Otis Parker told me that Tom Pitner was going to put up the fence, and I sent him word not to put it up. I did not

want it put up, because I wanted to move it over into the Blount lands, and if it was put up I would have to tear it down. I would rather build a fence than to tear one down. One of the boys was up in the field, helding cattle, and had come down and told us that deceased was putting up the fence. I went over there, and Lou went with me. We got over there, and I told Tom that we come to see him about fixing the fence; and he said: 'All right. Come on.' I got over the fence, and went on, and Lou went across the prairie. When I got up within about forty yards of the wagon, and maybe fifty, Tom threw his gun across the wagon and shot at Lou. Lou broke and run, and Tom shot at him again, and Lou fell. I thought he had killed him. Tom then shot at me three times. I fell down in the grass. I had a pocket pistol, and began to shoot at him with that. I thought my life was in danger before I shot, and I shot at him. Tom Pitner shot at me once before I shot at him." It appears by the evidence that Lou Casner had a Winchester, and shot at deceased with it. Appellant further stated that he was going to get deceased to quit fixing the fence, if he could; and, if he did not quit, appellant did not know what he would have done, but was not coming to have a fight with him unless he jumped on him. From the foregoing statement we believe that murder in the first and second degrees and the perfect right of self-defense are presented. We note that the court gave a charge upon these issues, as well as upon manslaughter and provoking the difficulty.

Bill number 18 complains of the following charge of the court: "If, from the evidence before you in this case, you find that deceased, Tom Pitner, was the owner of the Welch place, under a purchase from the State of Texas, and was in possession thereon under such purchase, either by himself or tenant, then deceased's possession was legal; and you further find from the evidence that the Welch place was contiguous to the Blount pasture, and that the west line of the Blount pasture fence was also the east line of the fence which inclosed the Welch place, and that the fence around the Welch place was joined to the west line of the Blount pasture fence, then deceased, Pitner, had the legal right to put up that part of the Blount pasture fence which formed a part of the inclosure around the Welch place, unless you further believe from the evidence that defendant, John Casner, had given notice in writing to deceased, Tom Pitner, or his agent, attorney, or lessee, of his intention to separate or withdraw the Blount pasture fence from the fence which inclosed the Welch place, for at least six months prior to the time when deceased put up said Blount fence; and if, under this charge, and the evidence in this case, you find that the deceased, Pitner, had the legal right to put up that part of the Blount pasture fence (if any) which formed a part of the inclosure around the Welch place, at the time of the killing of deceased, then deceased had the legal right to go armed to the place where he put up said fence, and to use such force as might appear to him, from all the facts and circumstances, to be

necessary to repel and overcome any unlawful resistance or interference that he might meet with in putting up said fence; and if, from all the facts and circumstances in evidence before you in this case, viewed from deceased's (Pitner's) standpoint, that at the time of the killing deceased had reason to believe, and did believe, from words spoken or acts done by John Casner and Lou Casner, or either of them, that they, or either of them, intended to immediately take his life or do him serious bodily injury, then deceased had the right to defend himself and fire the first shot, although you may believe that he was in fact in no actual danger." The objections urged by appellant are "that it is not the law of the case, and prejudicial to the rights of defendant, misleading to the jury, and is upon the weight of the evidence, and denies the right of defendant to resist an attack by deceased if the deceased fired the first shot; because there is no testimony tending to show that there was any unlawful resistance or interference on the part of either or both of the Casners to his putting up the fence; because there was no testimony tending to show that the Casners, or either of them, intended to immediately or otherwise take deceased's life or do him serious bodily injury, and in effect, excused Pitner's first shot, without evidence to support the proposition, and if deceased was not in danger; because it makes defendant responsible for what Pitner believed, regardless of what they [Casners], or either, did or did not do."

Under the provisions of articles 2501-2503, Revised Statutes, deceased had a right to go in a peaceful manner, as he did, and repair the fence that had been torn down,—the same being a joint fence between his place and the Blount pasture; and, of course, he had a right to secure arms to protect himself against a contemplated assault. And if, while deceased was engaged lawfully in repairing the fence, appellant, either acting alone or in conjunction with his son, sought and made an attack upon deceased, and killed him, then appellant would be guilty of murder in the first or second degree, as indicated in the court's charge. If appellant, acting with his son, and knowing the unlawful intent of his son, killed deceased upon express malice, he would be guilty of murder in the first degree; or if appellant, acting alone or with his son, killed deceased upon implied malice, he would be guilty of murder in the second degree; or if appellant's son killed deceased, upon either express or implied malice, and appellant was present, knowing the unlawful intent of his son, and aided him by acts, or encouraging him by words or gestures, in the commission of the offense, then appellant would be guilty of murder in the first or second degree, as the facts or law might justify. The charge of the court erroneously restricts the rights of appellant to the intent of deceased. This can not be done. Appellant's intent must be judged by his own purpose, and not by the intent of deceased. Certainly deceased would have the right to shoot in self-defense, viewed from his standpoint. This would be the law if deceased were living

and on trial, but he is dead. Then what are the rights of appellant? If appellant did not go where deceased was putting up the fence with the intent to kill deceased, or if appellant and son, while acting together, each knowing the unlawful intent of the other, did not go to where deceased was, with the intent to kill him, and deceased fired upon them, without any overt act on their part, then appellant's right of self-defense would be perfect. In other words, appellant had a right to go where deceased was fixing the fence, and it would not be unlawful for him to object to deceased fixing the fence, and if, while so engaged, deceased fired upon him or his son, he had a right to protect his person from any unlawful violence so offered by deceased; and in doing so he could use whatever force was necessary, viewed from his standpoint, to protect his life or the life of his son. The evidence shows that the fence was upon deceased's land, and, as stated above, it joined the Blount pasture; and, the fence in controversy being a division line fence between deceased and the Blount pasture, appellant would have no right to remove the same, even if it did belong to his landlord, unless six months' notice had been given as provided by the above statutes; and if he attempted to do so by violence, and was resisted, and attacked deceased, and then slew him, he would be guilty of murder in the first or second degree, as the law and the facts might justify.

In bill number 3, appellant objects to the admission by the court of the following testimony: The State was permitted to prove by the witness Kit Parker that Lou Casner stated that he (Casner) had planted five men, and, if Tom Pitner put up that fence, he (Lou Casner) would plant another. Said Casner further said that he had heard that Tom Pitner had plenty of nerve, and, if he put up that fence, he guessed Pitner would have a chance to try it. Witness told deceased about his conversation. Defendant was not present. Appellant objected to this testimony, because appellant was not present, and there is no testimony showing a conspiracy or common design to act together on the part of Lou Casner and defendant, at that or any other time, to kill deceased or do him any injury; and the court overruled said objections. The following qualification is attached to the bill: "At the time the testimony mentioned in this bill was offered, testimony had already been introduced tending to show that John Casner and Lou Casner went to the place of the killing together, and acted together in the commission of the killing, as shown by statement of facts." Bill number 22 presents the same matter, as follows: "The State was permitted to prove by Otis Parker that he was present and heard the conversation between Kit Parker and Casner. Appellant objected on the same grounds as above stated, and the court qualifies this bill as the former one. We think this testimony was admissible, in view of the record before us. However, the court should have placed a qualification upon the same. The jury should have been told that, if appellant and his son agreed and conspired together for the purpose of taking the life

of deceased on account of deceased rebuilding the fence, and in all things they acted together in the accomplishment of that purpose, then the declarations of Lou Casner, if made prior to the formation of said agreement, would be admissible against appellant. But if appellant did not form the design and agreement with Lou Casner, his son, to take the life of deceased, then said testimony could not be considered in passing upon the guilt or innocence of appellant. This character of evidence is ably discussed in Harris v. State, 31 Texas Criminal Reports, 414. If A. and B. form a conspiracy to commit a certain crime, and C. subsequently enters into the conspiracy with A. and B., knowing the unlawful purpose and intent of A. and B., the acts and declarations of either A. or B., or both of them, would be admissible against C., in explaining and illustrating the common design of all. But, certainly, if C. did not enter into the conspiracy with the common design and intent, the acts and declarations of A. and B. would not be admissible against C., where he is upon trial.

In his eighth bill of exceptions, appellant complains of the twenty-third paragraph of the court's charge, as follows: "You are further instructed that the defendant, in addition to his plea of not guilty, interposes the plea of self-defense; and upon this issue, and as the law governing the same, you are instructed as follows: (1) Homicide is justifiable in the protection of the person from an unlawful and violent attack, and in such case all other means must be resorted to for the prevention of the injury, and the killing must take place while the person killed is in the act of making such unlawful and violent attack, or while the person killed is doing some hostile act or making some hostile demonstration that would, viewed from the standpoint of the slayer, produce in his mind a reasonable fear of death or some serious bodily injury. (2) * * *" It is not the law of this State that "all other means must be resorted" to, where defendant justifies a killing on the ground of self-defense, in order to prevent injury. If appellant killed deceased, and at the time he killed deceased, without any unlawful act on appellant's part, deceased was attempting to kill defendant, or it reasonably appeared to defendant, viewed from his standpoint alone, by words or acts, or both by words and acts, that deceased was about to make an unlawful attack upon the person of appellant, then in that event appellant would have the right to use whatever means were reasonably necessary to protect his life or his person from serious bodily injury. And this would be the case although it might subsequently appear that appellant used more force and more violent means than were necessary to protect his life. In other words, appellant has a right to act upon danger or reasonable appearance of danger .

In view of another trial, we feel constrained to pass upon the court's charge in another particular. The record before us does not require the court to charge on the law of provoking the difficulty.

There are various assignments of error by appellant that we have

not reviewed; feeling they will not likely occur upon another trial, and it is not necessary for us to pass upon the same. But, for the errors discussed, the judgment is reversed, and the cause remanded.

*Reversed and remanded.*