### A. B. MACLIN v. THE STATE.

No. 1429. Decided February 21, 1912.

**1.—Murder—Charge of Court—Self-Defense—Charge as a Whole—Standpoint of Defendant.**

Where a section of the court's charge on self-defense, as a whole, submitted the question of danger from an attack by the deceased and standpoint of defendant substantially correct, there was no error.

**2.—Same—Charge of Court—Self-Defense—Resorting to Other Means.**

Where the court's charge on self-defense submitted the issue of resorting to other means as a qualification of defendant's right of self-defense, and the evidence showed that such charge was not applicable to the facts, there was reversible error.

### 3.—Same—Rule Stated—Standpoint of Defendant—Self-Defense.

If the attack, if made at all, was made with a deadly weapon, and from the defendant's standpoint, produced a reasonable expectation or .fear of death or serious bodily injury, it is error to charge on the theory that defendant must have resorted to other means than retreat to avoid the necessity of killing his assailant. Following Kendall v. State, 8 Texas Crim. App., 569, and other cases.

### 4.—Same—Resort to Other Means—Rule Stated—Self-Defense.

If defendant's acts under a reasonable expectation or fear of death or serious bodily injury produced by the acts of his adversary at the time of the homicide, he is not bound to retreat, but may slay his adversary if the danger be imminent and pressing, or if it reasonably appears to be to defendant, viewed from his standpoint at the time. Following Foster v. State, 11 Texas Crim. App., 105, and other cases.

### 5.—Same—Threats—Hostile Demonstration.

A charge is error which requires defendant to resort to other means before he could kill, when the defensive theory is that his life had been threatened and deceased had made hostile demonstrations at the time of the homicide. Following Crenshaw v. State, 48 Texas Crim. Rep., 77.

### 6.—Same—Case Stated—Resort to Other Means—Self-Defense.

Where, upon trial of murder, there was evidence that the deceased attacked defendant with a knife after having made threats against defendant, it was error in the court's charge to limit the right of self-defense to the viewpoint of the jury, or require him to resort to other means before exercising his right of perfect self-defense.

### 7.—Same—Charge of Court—Threats—Standpoint of Defendant.

Where, upon trial of murder, there was evidence of communicated threats, it was reversible error in the court's charge to require the jury to find that the deceased actually made the threat against the life of the defendant, as defendant would have the right to act on them if he believed they were made; and it was also error to require the jury to find that deceased manifested an intention to execute the threats, as such must be viewed from the standpoint of defendant.

### 8.—Same—Charge of Court—Serious Bodily Injury.

Where, upon trial of murder, the evidence raised the issue of threats and serious bodily injury, the court should have charged the jury that defendant had the right to defend against threats to inflict serious bodily injury.

### 9.—Same—Self-Defense—Requested Charges.

Where, upon trial of murder, the defendant presented several requested charges which pointed out the errors in the court's charge on self-defense, the same should have been submitted.

### 10.—Same—Evidence—Fabrication of Testimony.

Where, upon trial of murder, it was shown by the testimony that the widow of deceased and his brother had a private conversation after the said widow had testified that the knife near the deceased was his, but after such conversation, stated that it was the knife of the defendant, when the State's witness and another made a second examination of the deceased's body as to a knife and could not find any, but thereafter a pocketknife was found in deceased's pocket, it was error not to permit defendant's counsel to ask said State's witness why he made the second search, in order to show fabrication of testimony.

### 11.—Same—Evidence—Exculpatory Facts.

Upon trial of murder, where defendant's witness testified that he saw defendant crying at the house of deceased some time before the homicide,

Vol. LXV Crim.—25.

because defendant's wife had died and deceased at that time remarked that the defendant was a damned hypocrite, the said witness should have been permitted to testify that the defendant was then preparing to go to his dead wife, to counteract the statement of the deceased then made.

### 12.—Same—Evidence—Character of Deceased.

Where, upon trial of murder, an inquiry was made into the reputation and character of the deceased, and the State was undertaking to prove that the deceased had not had a difficulty with other people, it was error not to permit the defendant to show that he had such difficulty and that he had had trouble with his own brother.

### 13.—Same—Evidence—Acts of Deceased.

Upon trial of murder, where the evidence disclosed threats by the deceased against the defendant, the court should have permitted testimony offered by the defense that the deceased was in the habit of going armed with a pistol.

### 14.—Same—Evidence—Moral Turpitude.

Where, upon trial of murder, no testimony had been offered by the State that defendant had been indicted for an offense of the grade of a felony or misdemeanor involving moral turpitude, it was error to permit State's counsel, on cross-examination of defendant, to ask whether it was not a fact that he knew he had been investigated by the grand juries of his county for the offense of theft of cattle, there being no testimony that defendant was threatened with such prosecution by the deceased of which the defendant had notice.

### 15.—Same—Evidence—Husband and Wife.—Bill of Exceptions.

Where the bill of exceptions was not sufficiently definite to show whether the matters about which the second wife of defendant was asked by the State were new and independent matters, the same could not be considered on appeal.

### 16.—Same—Evidence—Negative Testimony.

Upon trial of murder, a State's witness should not have been permitted to testify for the State that he had never heard the deceased make any threats against the defendant; although said witness had been living with deceased.

### 17.—Same—Evidence—Conditional Threats.

Upon trial of murder, the court should not have admitted testimony of alleged threats by defendant which were not shown to have been directed towards the deceased and which were conditional and uncertain in their character. Following Fuller v. State, 54 Texas Crim. Rep., 454, and other cases.

### 18.—Same—Evidence—Conversation Between Third Parties.

Where, upon trial of murder, the defendant had already testified that he had not been informed of a certain conversation occurring between the wife of deceased and her sister-in-law, to the effect that defendant was not treating deceased right and that the latter was going to turn him over to the grand jury for stealing cattle, it was error to admit this conversation in evidence; there being no testimony that the same was ever communicated to the defendant. Following Brumley v. State, 21 Texas Crim. App., 222, and other cases.

### 19.—Same—Argument of Counsel.

See opinion admonishing courts and counsel that arguments of counsel must be kept within the record and confined to the evidence of the case.

### 20.—Same—Statement of Facts—Practice.

Wherever it is practicable, the statement of facts should be made up with reference to the questions to be decided, and matters which are irrelevant should not be embraced therein.

Appeal from the District Court of Wood. Tried below before the, Hon. R. W. Simpson.

Appeal from a conviction of murder in the second degree; penalty, ten years imprisonment in the penitentiary.

The opinion states the case.

*F. J. McCord* and *B. B. Hart* and *W. N. Jones* and *M. D. Carlock,* for appellant.—On question of fabricating testimony and moral turpitude: Brown Criminal Law, sec. 337, and authorities there cited; Campbell v. State, 62 Texas Crim. Rep., 561, 138 S. W. Rep., 607; Sheppard v. State, 56 Texas Crim. Rep., 604, 120 S. W. Rep., 446; Knight v. State, 55 Texas Crim. Rep., 243, 116 S. W. Rep., 56; Wade v. State, 90 S. W. Rep., 503; Red v. State, 39 Texas Crim. Rep., 414.

On question of threats of defendant: Holley v. State, 46 S. W. Rep., 39; Strange v. State, 42 S. W. Rep., 551; Godwin v. State, 43 S. W. Rep., 336; Gains v. State, 53 S. W. Rep., 623.

On question of court's charge on self-defense: Best v. State, 61 Texas Crim. Rep., 551, 135 S. W. Rep., 581, and cases cited in opinion.

*C. E. Lane,* Assistant Attorney-General, and *J. H. Beavers,* for the State.—On question of admitting evidence of motive: Kemp v. State, 13 S. W. Rep., 869; Godwin v. State, 43 S. W. Rep., 336; Sparks v. Com., 20 S. W. Rep., 167; State v. King, 24 Pac. Rep., 265.

On questions of declaration of third parties and drawing out part of conversation: Pharr v. State, 9 Texas Crim. App., 129; Sager v. State, 11 Texas Crim. App., 110; Stockman v. State, 24 Texas Crim. App., 387; Gallagher v. State, 28 Texas Crim. App., 247; Spearman v. State, 30 S. W. Rep., 229; Lancaster v. State, 35 S. W. Rep., 165; Pace v. State, 20 S. W. Rep., 762.

On the question of the court's charge on threats and self-defense: Barnes v. State, 45 S. W. Rep., 495; Bryant v. State, 47 S. W. Rep., 373; Smith v. State, 50 S. W. Rep., 938; Fielding v. State, 48 Texas Crim. Rep., 334, 87 S. W. Rep., 1044; Spangler v. State, 61 S. W. Rep., 314.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at ten years confinement in the penitentiary.

There was a considerable amount of evidence introduced showing threats made by the deceased against appellant, both to do him serious bodily injury and to take his life. There is also an abundance of evidence to the effect that deceased was a dangerous man, and one who would execute threats he might make.

1. The court charged the jury in regard to self-defense as follows: "I will now, gentlemen, give you in charge the law of justifiable

homicide, and will explain to you the circumstances under which the law permits and justifies the killing of a human being. First, the defendant was justified in such killing if he did so to prevent Quince Everett from killing or maiming him, or to prevent Everett from inflicting serious bodily injury on him, provided it reasonably appeared by the acts of Everett, or by the words coupled with the acts of Everett, that it was the purpose and intent of Everett to kill defendant, or to inflict serious bodily injury on him; and the killing must have taken place while Everett was in the act of killing defendant, or of inflicting such bodily injury on him, or after some act done by Everett showing evidently an intent to kill defendant, or to inflict such injury on him. In the second place, the defendant was justified in such killing if he did the same to protect himself against any other unlawful and violent attack on the part of Everett besides an attack with intent to kill defendant, or to inflict serious bodily injury on him; but to justify himself in killing Everett to defend himself from an attack by Everett not amounting to an attempt to kill him, or to inflict serious bodily injury on him, the defendant must have resorted to all other means for the prevention of the injury, and the killing must have taken place while Everett was in the very act of making such unlawful and violent attack, but the defendant was not, in any event, bound to retreat to avoid the necessity of killing Everett. In the third place, in order to justify the defendant in killing Quince Everett, it is not essential that there should have been any actual or real danger to the defendant's life or person. If Everett made an unlawful attack on the defendant, or did any act, or made any demonstration which produced in defendant's mind a reasonable expectation or fear of death or some serious bodily injury, and if the defendant shot and killed deceased under such reasonable expectation or fear, arising from such act or demonstration of Everett, he was justified in so doing, and in law it would make no difference whether the danger to defendant's life was real or imaginary, if it had the appearance to him of being real, he had the same right to act and to the same extent as if the danger was real."

Several objections are urged to this, first, to that portion of the charge in which the court instructed the jury that the defendant would be justified, provided "it reasonably appeared by the acts of Everett, or by words coupled with the acts of Everett, that it was the purpose and intent of Everett to kill the defendant," etc. It is urged that this left it for the jury to determine whether there was danger at the time from the acts and words of Everett, or whether there were any words or acts on the part of Everett at the time of the homicide. It occurs to us that when this whole section is taken together there is no substantial merit in this contention.

To the second clause of the charge on self-defense exception was taken wherein the court submitted the issue of resorting to other means as a qualification of his right of self-defense. This criticism

is well assigned. Mr. Branch in section 449 of his work on Criminal
Law, admirably states the proposition correctly in this language:
"If the attack, if made at all, was made with a deadly weapon, and
from the defendant's standpoint produced a reasonable expectation
or fear of death or serious bodily injury, it is error to charge on
the theory that defendant must have resorted to other means than
retreat to avoid the necessity of killing his assailant." Kendall v.
State, 8 Texas Crim. App., 569; Ainsworth v. State, 8 Texas Crim.
App., 532; Foster v. State, 11 Texas Crim. App., 105; Branch v.
State, 15 Texas Crim. App., 96; Gilly v. State, 15 Texas Crim. App.,
287; Cartwright v. State, 16 Texas Crim. App., 473; Morgan v.
State, 16 Texas Crim. App., 593; Hunnicutt v. State, 20 Texas
Crim. App., 632; Williams v. State, 22 Texas Crim. App., 497; Or-
man v. State, 22 Texas Crim. App., 604; Orman v. State, 24 Texas
Crim. App., 495; Kelly v. State, 27 Texas Crim. App., 562; Baltrip
v. State, 30 Texas Crim. App., 545; Risby v. State, 17 Texas Crim.
App., 517; Cline v. State, 28 S. W. Rep., 684; McCandless v. State,
42 Texas Crim. Rep., 58; Casner v. State, 42 Texas Crim. Rep.,
118; Shumate v. State, 38 Texas Crim. Rep., 266; Floyd v. State,
52 Texas Crim. Rep., 103; Crenshaw v. State, 48 Texas Crim. Rep.,
77; Snowberger v. State, 58 Texas Crim. Rep., 530, 126 S. W. Rep.,
878; Anderson v. State, 60 Texas Crim. Rep., 314, 131 S. W. Rep.,
1124.

This proposition is also stated tersely by Mr. Branch in his work:
"If defendant acts under a reasonable expectation or fear of death
or serious bodily injury produced by the acts of his adversary at the
time of the homicide, he is not bound to retreat nor to resort to other
means of averting such danger, but may slay his adversary if the
danger be imminent and pressing, or if it reasonably appears to be
to defendant viewed from his standpoint at the time." Foster v.
State, 11 Texas Crim. App., 105; Branch v. State, 15 Texas Crim.
App., 96; Gilly v. State, 15 Texas Crim. App., 287; Cartwright v.
State, 16 Texas Crim. App., 473; Hunnicutt v. State, 18 Texas
Crim. App., 498; Kelly v. State, 27 Texas Crim. App., 562; Baltrip
v. State, 30 Texas Crim. App., 545; Snowberger v. State, 58 Texas
Crim. Rep., 530, 126 S. W. Rep., 878; Hunnicutt v. State, 20 Texas
Crim. App., 632; Crenshaw v. State, 48 Texas Crim. Rep., 77; Orman
v. State, 22 Texas Crim. App., 604.

It is also tersely and correctly stated as follows: "A charge is
error which requires defendant to resort to other means before he
could kill, when the defensive theory is that his life had been threat-
ened and deceased had made hostile demonstrations at the time of the
homicide." Crenshaw v. State, 48 Texas Crim. Rep., 77.

These propositions of law are not debatable, and where the facts
justify or call for such application of these rules, then it would be
error on the part of the court to limit the right of self-defense to

the viewpoint of the jury, or require him to resort to other means before exercising his right of perfect self-defense.

It is not necessary to go into anything like a detailed statement of the facts of this case in this connection. The evidence shows that the deceased ·had made numerous threats to do serious bodily injury as well as to take life of appellant. The record also discloses from various witnesses the dangerous character of the deceased and the likelihood of his putting into execution any threat that he might make. There were but two eyewitnesses to the homicide in its entirety; one of these was the deceased, and the other the appellant. The wife of appellant was an eyewitness to a part of the trouble, and corroborates the testimony of the appellant as far as she saw the transaction. The record also shows that the deceased was a son-in-law of appellant, and trouble had grown up between them about some financial and land matters. Appellant had deeded fifty acres of land to deceased and his daughter, wife of deceased, and had done other things towards assisting them somewhat around their little home, which was adjoining that of appellant, divided only by the imaginary line of demarcation which divides adjoining tracts of land. On the morning of the difficulty appellant began plowing, and having been sick the day before he was unable to continue his plowing and secured the services of a neighboring boy. He went to the house and got his gun to carry with him around his field. Somebody, and he thought it was deceased, had been letting down his fence and had taken the wire from the gate so that stock could get in upon his crop and destroy it. He took his gun, he says, because of his fear that deceased would execute his threats. He finally reached the gate where the wire had been taken from it, thus leaving it open, and while working at it deceased came upon the scene and began to curse and abuse him, using quite obscene and insulting epithets, such as calling him a damned lying son-of-a-bitch and similar statements. This led to a difficulty in which appellant swore deceased was the aggressor. Deceased had a hoe in his hand and undertook to use it upon appellant. In their struggle appellant succeeded in getting the hoe, and when he did that deceased jerked out his knife and closed with him, and began cutting him. Four stab wounds were inflicted on appellant, one in the left breast between the fifth and sixth rib, cutting into the cavity and affecting the lower edge of that lung; one was in the left arm, splitting it to the bone; another was in the right arm just under the right shoulder, and another one was under the shoulder blade. It is unnecessary to describe these wounds further than to say the doctor had to take stitches—two or three—to close them. Appellant bled rather freely from the effect of the wounds. He finally succeeded in getting loose from deceased, secured his gun, which was a short distance from him, and as he did this deceased came upon him again. He told him to stop. This caution was not heeded and appellant fired. This did not succeed in stopping him

and he fired the second shot. These shots resulted fatally. There was a large pocketknife found about where appellant says the first part of the difficulty occurred. The State's theory was that appellant's testimony did not correctly present the facts of the homicide, but that appellant went upon the ground where the deceased was at work and without justifying circumstances killed him. The details of the circumstances relied upon by the State are thought not necessary to be mentioned, as the charge gave the State the benefit of that side of the case, and the jury evidently did not believe appellant's testimony. Whatever the court or jury may have thought about the value, or weight of the evidence, or the credibility of the witnesses, it is nevertheless the duty of the court to give in charge the law applicable to the theories of the accused as developed by his evidence. Under this statement it is not possible that the issue in regard to resorting to other means could have arisen. Nor was it proper for the court to leave the question of self-defense from their viewpoint in the light of the matters as they saw it at the time of trial. They must view, and the court must so charge them, the case from the standpoint of the defendant at the time of the homicide.

2. The court gave the following instruction on the law of threats:

"Where a defendant accused of murder seeks to justify himself on the ground of threats against his own life, he may be permitted to introduce evidence of the threats made, but the same shall not be regarded as affording a justification for the offense unless it be shown that at the time of the homicide the person killed by some act then done manifested an intention to execute the threat so made. Now, if you shall find that the deceased made threats against the life of the defendant, and if you find that at the time he fired the fatal shot, it reasonably appeared to the defendant, viewing all the facts and circumstances from his standpoint, that the said Everett by some act then done manifested an intention to execute the threats so made, then you are instructed that the defendant would be justifiable, and if the killing of Everett thus occurred, you will acquit the defendant."

Various criticisms are urged to this charge which we think are well taken. It will be observed by the language of the court, that the jury must find that deceased made the threats against the life of defendant, and if it reasonably appeared to defendant that he was about to execute them, he would be justified. It is not how the jury may view this matter of threats as to whether they were made or not, but if the defendant was informed the threats were made and believed them, he had the right to act upon such information whether the jury believed the threats were or were not made. The jury can not view this matter from their viewpoint at the trial, but they must take it as defendant believed and acted upon it at the time of the homicide. Mr. Branch in his work collates the authorities, and thus states the proposition, which we think is the correct rule deducible from the cited cases: "It is error to require the jury to find that

the threats were in fact made. Defendant would have the right to act on them if he believed they were made." Swain v. State, 48 Texas Crim. Rep., 98; Huddleston v. State, 54 Texas Crim. Rep., 93; Buckner v. State, 55 Texas Crim. Rep., 511; Lundy v. State, 59 Texas Crim. Rep., 131; Hightower v. State, 56 Texas Crim. Rep., 248; Johnson and Black v. State, decided at the present term. It has also been held wherever the question has come up for revision, that a charge on threats in connection with self-defense which requires the jury to find that deceased manifested an intention to execute the threats, is error because it ignores the matter from the standpoint of the defendant. Adams v. State, 47 Texas Crim. Rep., 347; Beard v. State, 47 Texas Crim. Rep., 50. This charge is also deficient in that it did not inform the jury of appellant's right to defend against threats to inflict serious bodily injury. The evidence of the threats is pointedly shown upon this phase of the case.

3. Quite a number of special charges were requested and refused which, in one form or another, presented these matters so as to correct errors pointed out. It is unnecessary to discuss them in view of what has been said. The court, of course, upon another trial will charge the jury in accordance with what has been already said.

4. Fifty-nine bills of exception were reserved during this trial, and the record is very voluminous. The statement of facts alone contains 360 pages of closely typewritten matter. It is not the purpose of this opinion to review all of these questions. Some of the matters are of such grave import that in view of another trial we deem it necessary to notice them, with the understanding that the trial court will be governed with reference to the other questions by what will be said.

Appel and Blackburn were used as witnesses. Appel was constable and Blackburn justice of the peace. The bill recites that while Appel was testifying for the State, on cross-examination by appellant's counsel, and after he had testified that he was constable of the precinct in which the homicide occurred, he went to the scene of the homicide soon after it occurred with the justice of the peace, Ed Blackburn, and after he had testified that he had examined and searched the dead body of Quince Everett in connection with said Ed Blackburn, justice of the peace, and did not find any knife on the person of the deceased, after making a thorough examination, and after he had testified that he found a large knife with a big blade on the ground where the difficulty occurred, and that the same was open and had blood on it, and after he had testified that the said knife was exhibited to the State's witness, Mrs. Irma Everett, and after he had testified that she had first identified the knife as that of her husband, and later identified it as being the knife of the defendant, and after he had testified that he and Blackburn then made a second examination of the dead body of Quince Everett, and a more rigid examination than the first; that he assisted the said

Blackburn in making said examination; that they felt of deceased's pockets from the outside and ran their hands on the inside of the pockets; that the pants deceased had on had four pockets, two before and two behind, and a small watch pocket, making five in all, and that on said second examination they did not find any knife: Defendant's counsel then asked said witness, on cross-examination, why he searched the deceased the second time, to which question the counsel for the State then objected, which objection was by the court sustained. Appellant urged his exceptions, and the bill further recites if the witness had been allowed to answer the question he would have answered that the wife of the deceased, Mrs. Irma Everett, after having first identified the knife as that of deceased, she had a private talk with deceased's brother, Mart Everett, when she then stated that the knife was not her husband's knife; that this occurred in the presence and hearing of the justice of the peace, Ed Blackburn; that "we then searched the deceased the second time in order to thoroughly satisfy ourselves that the deceased did not have a knife on his person." The contention is that this was material and would become material in the further trial of the case as to the controverted issue as to whether or not deceased had a knife on his person at the time he was killed, and was material because the State showed by a State witness, Thad Jacobs, that some five or six hours after this occurred a knife was found in the pocket of deceased's, Quince Everett, pants. This testimony, we think, was clearly admissible. If the State witnesses were manufacturing testimony, it is competent to show this fact. These two officers were in the discharge of their duty examining into the physical facts and the other circumstances of the case with reference to the homicide, and this occurred on the ground where the homicide occurred. Mrs. Everett, the widow of the deceased, had first identified the knife picked up at the scene of the difficulty as belonging to her husband. The examination by the two officers of the body of deceased discovered the fact that he had no knife about his person. If the knife was placed in the pocket after that and after the conversation with Mart Everett, then there was fabrication and manufacture of testimony, which was antagonistic to defendant, affected his case vitally, and this conversation between the widow of deceased and the brother of the deceased indicated the manufacture of the testimony. It was after this conversation that Mrs. Everett changed her testimony. This testimony would show the knife was placed in the pocket of deceased some time afterward, and subsequent to the time of the examination of the body by the officers. It was admissible also, because the integrity of the witnesses for the State was thus directly attacked, and any evidence which would sustain them bearing upon that issue would be admissible. See Branch's Criminal Law, section 337. Any witness in the case is entitled to explain any fact tending to create a distrust of his integrity or truthfulness. Gallagher v.

State, 28 Texas Crim. App., 247; Bruce v. State, 31 Texas Crim. Rep., 590; Spencer v. State, 59 Texas Crim. Rep., 217, 128 S. W. Rep., 118; Cornett v. State, 54 Texas Crim. Rep., 372; Burks v. State, 40 Texas Crim. Rep., 167; James v. State, 40 Texas Crim. Rep., 190; Hedrick v. State, 40 Texas Crim. Rep., 532; Ivey v. State, 41 Texas, 35; Brace v. State, 43 Texas Crim. Rep., 48; Maxey v. State, 58 Texas Crim. Rep., 118, 124 S. W. Rep., 927; Hinds v. State, 11 Texas Crim. App., 238; Ball v. State, 36 S. W. Rep., 448; Kunde v. State, 22 Texas Crim. App., 65; Turner v. State, 51 S. W. Rep., 366. This evidence was clearly admissible on both propositions under the authorities.

What has been said with reference to Appel will also apply to other bills of exception with reference to the same witness as well as the testimony of the witness Blackburn.

5. Another bill recites that while the witness Lott was testifying as a witness in behalf of the defendant, and after he had testified that he passed the house of deceased, Quince Everett, one day and he heard someone crying, and that after he went in the house to see who it was that was crying, and found it was the defendant crying; he then learned that defendant had just received news that his wife was dead, and had just died suddenly at Lindale,. and that he had just testified that the deceased, Quince Everett, told him on the way down to town that the defendant was a damn hypocrite and he was glad his wife was dead, and the defendant then asked the witness if he knew what and the reasons why the defendant was waiting at deceased's home at that time, the State objected and the court sustained said objection. If the witness had been· allowed to do so, he would have testified that defendant was then waiting for a train to go to Lindale, where his wife was dead. The contention is that this was material in view of what had been said by Quince Everett, and would have explained the absence from the defendant of his wife at the time of her death. The court rejected this as shown by his qualification on the ground that it was the opinion of the witness which was sought based on the facts, and the facts should have been stated and the jury determine therefrom why he was waiting at Everett's house. There was no way for this witness to know why defendant was waiting at the house of deceased except from the statement. of the parties. The statement of Quince Everett, the deceased, · had just been placed before the jury, that appellant was a damn hypocrite, and he was glad his wife was dead. Inasmuch as this matter was presented in this way, we are of opinion that the witness Lott should have been permitted to testify as desired by appellant. It was in connection with the same matter, and to meet as best he could the statement of his son-in-law, that he was a damn hypocrite and was rejoicing at the death of his wife. It would have a tendency to show this statement of his son-in-law under the circumstances and place stated where it occurred was not true. While it

may be of no great importance, yet the matter had been placed before the jury in this attitude, and any explanation that could be made of it which would benefit appellant ought to have been permitted.

It might be stated, in this connection, there was more of this character of testimony before the jury, and both the court and the appellant in the bill refer to the statement of facts as to this entire subject. We do not feel called upon to go through 360 pages of evidence to collate all the facts bearing upon such questions, but suffice it to say, if this matter is presented in this way upon another trial, Lott's testimony should go to the jury to be weighed along with the other facts introduced in this connection.

6. Another bill recites that while the defendant's witness, Bob Reich, was testifying, and after he had testified that he was acquainted with the general reputation of deceased for peace and quietude and was of such a character that he was a man who would "likely" carry a serious threat into execution, and after counsel for the State, on cross-examination, had asked witness if it was not a fact that he had never heard of deceased having any difficulties, and if it was not a fact that the deceased had the reputation of being a peaceable and law-abiding citizen, and that he had never had a fight or difficulty with anyone, and after witness had answered that he had known of deceased having difficulties, and that he had heard of him having difficulties with Jack Wooten and Moody boys, and Doug Moseley, and then upon redirect examination counsel for defendant asked said witness if he had ever heard of deceased having trouble with his own brother, Mart Everett, down on the lake, threatening to shoot Mart. The State interposed objection, which was sustained by the court, to which appellant excepted. Had the witness been permitted to do so, he would have answered and stated that he had heard that deceased had a difficulty with his brother, Mart Everett, down on the lake, and that in said difficulty he drew a gun on Mart and others interfered and kept him from shooting him. In the attitude this bill presents this matter, this testimony should have gone to the jury. While it may not have been of a serious nature or character, yet the issue was injected into the case with reference to the reputation and character of the deceased, and inasmuch as the State was undertaking to prove that the deceased had not had difficulties with other people, this should have gone to the jury. It was a fact that should have gone to the jury in connection with the matter as presented, inasmuch as the State had sought to show deceased had not participated in personal difficulties.

7. Another bill recites that appellant sought to prove that deceased went to the town of Mineola on divers occasions armed with a pistol, and would go into a certain store and leave the pistol while in town, and then secure it when he left. The bill is qualified by the judge with this statement: "That the question asked and to which objec-

tion was sustained was as follows: 'Ques. Did you ever see deceased with a pistol about your store?" Upon another trial, in view of the threats and the dangerous character of the man as contended by appellant, and the bringing home these matters to appellant, it is permissible to show in that connection that the deceased was in the habit of going armed with a pistol. It would be a fact of some moment and of a material nature if this matter was known to appellant that deceased usually went armed. If this phase of the testimony should arise upon another trial, the evidence rejected should be admitted.

8. Another bill recites the same facts, practically, with reference to the witness George Reeves, that were sought to be drawn from the witness Bob Reich, except the fact of the other difficulty inquired about was one that occurred in which the deceased tried to cut Pat Curl in the courthouse yard at Quitman. It was a case in which Curl was prosecuting witness against deceased for unlawfully selling intoxicating liquors in Wood County, and he would have killed Curl if he had not been prevented by bystanders. What was said in regard to the testimony of Reich is applicable to the testimony of the witness Reeves.

9. There are also bills of exceptions reciting, substantially, that before using appellant as a witness in his own behalf, the jury was retired at request of appellant, and the following matters occurred before the court in the jury's absence: It was stated to the court by counsel for defendant that appellant would be placed upon the stand as a witness, and it was anticipated that the State would ask questions as to whether or not the grand jury had investigated him on one or more occasions with reference to violations of the law, especially one with reference to cattle theft. This bill confines the matter to calling the court's attention to the fact that no bills were ever found, but the State would inquire into whether or not he was ever under investigation by the grand jury with reference to these matters, and it is stated that no bills were ever returned. After this matter occurred the jury was brought in, and during the cross-examination the State was permitted to cross-examine appellant with reference to whether or not the grand jury had ever examined as to whether or not they would find indictments against appellant for a violation of the law. Objections were urged to all of these inquiries. The bill further recites that counsel for the State declined to interrogate the defendant as to whether or not he had been charged with any crime of the grade of felony or any misdemeanor involving moral turpitude during the seventeen years that he, defendant, had resided in Wood County, whereupon appellant's counsel requested the court to admonish State's counsel not to ask defendant in the presence of the jury, while testifying in his own behalf, as to whether or not he had ever been charged and arrested for crime of the grade of a felony or for any misdemeanor involving moral turpitude during

the seventeen years of residence in Wood County; and they further
stated to the court, while the jury was out of the courtroom, that
possibly at some time in the past the grand juries of Wood County
might have investigated the defendant in connection with certain
alleged offenses, but that none of said investigations had resulted in
bill of indictment being returned against him; and they further
stated to the court that if there had been such investigation defendant
was not aware of the same at the time they were made. They further
stated to the court that they were informed and believed that the
counsel for the State were going to ask the defendant upon cross-
examination if it was not true that he had been investigated by the
grand juries of Wood County upon several occasions for the alleged
commission of several offenses; and the court was requested to ad-
monish counsel for the State and instruct him not to ask the defend-
ant, upon his cross-examination, any question regarding said inves-
tigations, if any were had. They further stated to the court they
did not believe it was legal, proper or permissible to prove that de-
fendant had been investigated by the grand juries, unless the State
should first prove that defendant had been indicted for some offense
of the grade of a felony or misdemeanor involving moral turpitude.
They further stated to the court that such testimony was inadmis-
sible, and would be injurious to appellant to ask him matters on
cross-examination before the jury with reference to the alleged grand
jury investigation, and that it would be injurious to compel appel-
lant's counsel to urge objections to such questions before the jury.
The jury was then recalled, and after appellant had finished testify-
ing in his own behalf on direct examination, and while being cross-
examined by the State, he was asked the following question: "Is
it not a fact that you know that you have been investigated by grand
juries of Wood County, Texas, for the offense of theft of cattle?"
A great many objections were urged to this, but he was permitted to
answer and did answer that he had not been investigated so far as
he knew, and that he had not heard anything about said investiga-
tion until this trial came up. The court says he admitted this evi-
dence for the purpose of throwing light on the motive of defendant
at the time of the killing. This testimony and this course of con-
duct was not permissible. If the State could prove or show that the
deceased had threatened to prosecute appellant for cattle theft, or
had sought to indict him for cattle theft, or had succeeded in indict-
ing him for cattle theft, and the matter was pending, or he was
threatened with such prosecution by the deceased, then it might be
permissible to show this as a motive, but unless knowledge could be
brought home to the defendant that the deceased was then prosecut-
ing him or was threatening to do it, we do not understand how this
character of investigation was permissible. It certainly could not
be used as a means of attacking his credibility, that the grand jury
may have investigated him at some time. This matter is mentioned

so that upon another trial it will not occur, unless there was an investigation of appellant instituted by the deceased, or threatened to be instituted by the deceased, charging appellant with cattle theft. As the matter is presented, this was error.

10. There is also another bill reserved with reference to the cross-examination of the wife of appellant. The bill is not sufficiently definite to enable us to say whether or not the matters about which she was asked by the State were new and independent matters. If it was, of course, it would not be permissible to ask her about it.

11. Another bill recites that the witness Folsom was permitted to testify for the State that he had never heard Quince Everett, deceased, make any threats against appellant. Various objections were urged to this, that it was negative in character, prejudicial, and was leading, calculated to prejudice the jury, and was inadmissible from any standpoint. The court says he admitted this because the witness Folsom had been living with deceased on his place for two or three years, and was admitted because defendant had proved threats by the deceased, and he permitted Folsom to testify on the theory that deceased had not made threats. We are of opinion this testimony was not admissible. There doubtless were a great number of witnesses in and out of Wood County who would have testified to the same facts. This is not very important, but inadmissible.

12. There is quite a lengthy bill of exceptions reserved to the action of the court admitting a conditional threat made by appellant overheard by one of the witnesses. The threat was about in this language: "I will fix the son-of-a-gun if he does not do what I want done." The substance of the environments under which this matter was introduced may be stated, substantially, this way: Appellant was standing on the outer edge of the sidewalk in Mineola facing eastward and looking down in the street. Hale was standing off a few feet from him. The deceased passed along in the rear of appellant, and after he had gotten by, appellant, talking to himself, said, "I will fix the son-of-a-gun if he does not do what I want done." Hale was cross-examined very closely by the State in regard to this matter, the State undertaking to get facts to indicate the remark was made with reference to deceased, and the defendant, of course, trying to eliminate this phase of it. Hale says the defendant did not look up nor towards the deceased, but was standing there looking down in the street, and made this remark just after the deceased passed. There were other parties not far away, people passing to and fro. Hale declined to indicate that appellant saw the deceased. In fact, he stated he did not know whether he saw him or not; that he just noticed him standing there looking down rather intently into the street, and this remark was made by defendant, to himself and addressed to nobody. In other words, it seems to have been rather an audible soliliquy. It was all that he did say. Under the authorities, we are of opinion that this testimony was not admissible under the

circumstances. The burden is on the State to show a threat by an accused person in a homicide case was directed against deceased or included him. Holley v. State, 39 Texas Crim. Rep., 301; Gaines v. State, 53 S. W. Rep., 623; Duke v. State, 133 S. W. Rep., 432. It has also been held that evidence of threats made by defendant, when such threats are not shown to have been directed towards the deceased, or to include him, are not admissible. There are a great many authorities cited in support of this proposition and will be found collated in Branch's Criminal Law, section 480. The burden being upon the State to show that a threat made by the defendant is admissible, it must be shown to individuate, point out or be directed at the deceased. We are of opinion further this threat being conditional, to be executed upon a further contingency in order to be admissible it should be shown that the condition is connected in some way with the deceased, and the threat must be based upon some act to be performed, or not to be performed by the deceased. This threat is too uncertain in its character, and is too indefinite, we think, to be admissible under the facts of this case and the authorities. In this connection we cite also Strange v. State, 42 S. W. Rep., 551; Goodwin v. State, 43 S. W. Rep., 336, 106 S. W. Rep., 389, 97 S. W. Rep., 1058; Fuller v. State, 113 S. W. Rep., 541, 133 S. W. Rep., 424; Fuller v. State, 54 Texas Crim. Rep., 454.

13. Another bill of exceptions recites that Mrs. Irma Everett was called by the State in rebuttal, and testified that she was at the home of the defendant, her father, on the evening preceding the difficulty which resulted in the death of her husband, and after she had testified that she had a conversation that evening with Mrs. Lanier Maclin, her sister-in-law, and the defendant was not present at the time of said conversation while she was talking to Mrs. Lanier Maclin, State's counsel then asked her what, if anything, she told Mrs. Lanier Maclin about the defendant's treatment of Quince Everett. Appellant objected, which objection was by the court overruled, and witness testified, "I told Mrs. Lanier Maclin that, in my opinion, my father was not treating Quince right about the land, and that Quince was going to turn him in to the grand jury for stealing cattle." Appellant objected on quite a number of grounds, among others, that it was prejudicial, made in his absence, was never communicated to him by anybody, and was not in rebuttal of any testimony offered by defendant, no predicate had been laid by the State to introduce the testimony, that the defendant had already testified that he had not been informed of said conversation, and the evidence had already been introduced as testified to by Mrs. Lanier Maclin, that she had not told the defendant or anyone else of this conversation, or about any conversation, or about what was said by Mrs. Everett about the matter before the difficulty on said occasion, except her husband as they went home that morning, and that the difficulty came up about the time they got home, and that her husband had

had no opportunity to tell the defendant about what he had heard before the difficulty and before deceased was killed. The court's qualification to this bill is as follows: "Allowed with the explanation that while Mrs. Everett was on the stand before Mrs. Lanier Maclin testified, counsel for defendant asked her in substance if she didn't tell Mrs. Lanier Maclin as they went out to the garden that she and Quince were coming over and make her father show them the letters, and then Mrs. Lanier Maclin was asked and testified at the instance of defendant that Mrs. Everett had told her in said conversation that she and Quince were coming over and make her father show them the letters; that the letters were from her relatives and she believed her father had written them something he didn't want her to know; that she advised Mrs. Everett not to do it, but she, Mrs. Everett, reiterated her determination to do it. And it was upon the examination of Mrs. Everett in reply to this testimony that she, Mrs. Everett, was asked what she did say in that conversation, and she replied in the language complained of in the bill." This explanation does not explain the matter in such way as makes the evidence admissible. The two sisters-in-law, Mrs. Everett and Mrs. Maclin, were at the home of appellant on the occasion mentioned, and appellant had received several letters, some of them business letters, and one from a son and another from a brother-in-law of appellant. Appellant's wife, stepmother of Mrs. Everett, at request of appellant had read the business letters, but the letters from her brother and uncle had not been read. She took offense at this, and she and Mrs. Maclin went into the garden and the conversation occurred there in which she told Mrs. Maclin that she believed her father had been writing to relatives something about herself and her husband he did not want them to know, and that she was going to tell her husband about it. Mrs. Maclin advised her not to do so, but she did. The record shows with reference to the evidence which was admitted over appellant's objection and set out in the bill, with reference to what her husband was going to do to her father in regard to the cattle matter, that same was not communicated to defendant or to anybody else, and it was known only between the two ladies and their husbands, and none of these conveyed the information to appellant. This testimony was clearly inadmissible. It was not germane to the conversation about the letters, did not serve to explain anything in the letters or connected with them, and injected into this case statements which, if they had been conveyed to appellant, would have been material for the State. There would be no question that had it been conveyed to appellant that his son-in-law, deceased, was going to prosecute him for cattle theft, and the killing occurred directly afterwards, it would have been important testimony, but without his knowledge of that fact it was res inter alios acta and inadmissible. Matters of this sort occurring between third parties and unknown to the accused can not be held to be testimony either as original

evidence or for the purpose of impeachment. If appellant had been informed prior to the homicide of the purpose of this statement, that deceased was going to prosecute him for cattle theft, it would have become evidence, upon the question of motive, and could have been used to suggest a reason for engaging in the difficulty, and would thus serve to strengthen the State's case, and, therefore, admissible. But it was unknown to him. The undiscovered and undisclosed condition of the injured party's mind can not be binding upon the accused, and is, therefore, clearly inadmissible. Brumley v. State, 21 Texas Crim. App., 222; Clark v. State, 56 Texas Crim. Rep., 293, 120 S. W. Rep., 179; Adams v. State, 44 Texas Crim. Rep., 64; Roberts v. State, 48 Texas Crim. Rep., 378; Fuller v. State, 30 Texas Crim. App., 559; Wooley v. State, 64 S. W. Rep., 1054; Ball v. State, 29 Texas Crim. App., 107. For collation of many other authorities see Branch's Criminal Law, sections 477, 478.

14. A bill of exceptions was reserved to the comment and remarks of counsel for the prosecution. Some of these remarks were not such as should have been indulged. Exceptions were reserved and charges asked and refused. Upon another trial these matters may not and should not occur, and it is suggested that counsel should keep within the record in discussing matters and not go outside to discuss matters that may have a material bearing upon the case, or that may illegally prejudice the case of the accused. It ought to be understood by courts and counsel that the case ought to be discussed alone from the standpoint of the evidence introduced before the jury. Just why arguments of a dangerous kind will be indulged, in view of the fact that the conviction if obtained is thereby endangered, is a little difficult to understand. It ought to be the rule, at least it is so intended by the laws of this State, that when the conviction has been had, the trial shall be sufficiently fair that on appeal the judgment may be affirmed if appeal should be taken, or at least it ought to be sufficiently fair that the judgment of the trial court should be final.

15. There are quite a number of other matters suggested in the record; some of them are important, but are largely of the same import as those discussed, and upon the same lines as the questions already decided. We will not discuss those, but remark that from the questions decided with reference to charges, the admission and rejection of testimony, the trial court will understand the theory upon which this case ought to be tried as viewed from this decision. The record is very voluminous, and the questions are many, bills of exception amounting to fifty-nine being reserved. It occurs to us counsel were permitted to take rather a wide latitude in the introduction of testimony, a great deal of which as embodied in the statement of facts could possibly not furnish any practical information to this court in deciding questions. The evidence is made out in

the record with as much particularity as if it was to be argued on this evidence to a jury. Wherever it is practicable to do so, the statement of facts sent to this court for its inspection should be made up with reference to the questions to be decided, and sufficiently full and fair that the court here may get a full understanding of the questions to be presented, but much of the details of the evidence on matters with which this court could have no concern and sheds no light, practical or otherwise, on matters involved, ought not to be embodied in the statement of facts. They do not elucidate, but rather tend to confuse.

For the errors indicated, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Prendergast, Judge, absent.