W. FRED JONES V. THE STATE.

No. 23691. Delivered November 12, 1947.

*E. T. Miller,* of Amarillo, Frank Day, of Plainview and *Simpson, Clayton & Fullingim,* of Amarillo for appellant.

*Richard Stovall,* former District Attorney of Floyd County, and *John Stapleton,* present District Attorney, of Floyd County, both of Floydada, *Harold M. Lafont,* District Attorney, of Hale County, and *Meade F. Griffin* (of *Griffin & Morehead*), all of Plainview, and *Ernest S. Goens,* State's Attorney, of Austin, for the State.

BEAUCHAMP, Judge.

The appeal is from a death sentence for murder. W. Fred Jones and his wife lived in Floydada where they owned and operated what is described as a large grocery store and market.

He is charged with killing H. C. Love, Jr., by shooting him with a shotgun. After indictment, the case was called in the 110th District Court, Floyd County, and the venue changed to the 64th District Court sitting at Plainview, Hale County.

The record in the case is quite lengthy, though there were few witnesses to the killing or any close incident thereto. Viewed from the State's standpoint it is a wanton and unexplained killing following a drunken evening in which the deceased, appellant, his wife, and three others were engaged. The deceased had been employed in the store by appellant and his wife for some time and was a trusted employee who had received promotions based on his faithfulness and ability. The day preceding the killing, which was Friday night, the appellant had directed his wife to enter on the books an increase in salary for the deceased. There is no indication in the record from either side that there had been any bad feeling between the parties, and no explanation is given for the killing other than that by the defense. If the defense is fabricated, the State has failed to produce any affirmative evidence to so indicate. From either standpoint, the facts reveal quite an unusual story explainable only as the result of drink. Nothing that occurred could, under the evidence, have had any other origin.

E. T. Dillard, the first witness called by the State, came in contact with appellant and his brother in the afternoon, about 4 o'clock, and, upon their invitation, went to the store and into the office in the balcony where they began drinking. Appellant's wife mixed the drinks. They were there until closing time. The deceased came into the balcony during the afternoon but did no drinking and no particular conversation was noted between him and appellant. During the afternoon appellant showed the witness an automatic type shotgun and made the remark, "If anybody got after me or I got after anybody or anything, that gun would take care of things." There is no evidence that the name of H. C. Love, Jr., was directly or indirectly connected with the remark.

After closing time appellant, his wife, Dillard, and two others who happened in, took steaks from the market and went out on the highway to a cafe where they had them cooked and served. The parties went in two cars. Appellant, his wife, and Love rode in Love's car. They ate their meal at a round table with the six of them together. After the meal Dillard and appellant got in the back seat of the car with Love driving. and appellant's wife on the front seat with him. The other two mem-

bers of the party departed together. The four returned to the store to get more whisky. Love still driving the car. Dillard remained in the car and went to sleep while appellant, his wife, and deceased went into the store. The witness said that he remained asleep in the car until after the killing and until awakened by the sheriff.

The State's evidence shows that soon thereafter appellant shot H. C. Love, Jr., with the gun he had exhibited in his office that afternoon. Love was taken to the hospital in a serious condition, from which he died at 2:30 the next afternoon. When his mother was called to his bed side he made a statement about the matter which is the subject of a bill of exception hereinafter discussed.

In defense of his act appellant testifies in his own behalf, in which he charges illicit relationship between the deceased and his wife, the details of which it is not necessary to relate other than that together they caused him to lie down and go to sleep on an improvised bed in the store, while the wife and deceased returned to the car in front. He became suspicious and watched them petting each other under circumstances which indicated their illicit relationship. Testifying in her husband's behalf, she admitted the conduct and said that she and deceased drove away to a school and completed their act on the ground by the car, while the witness Dillard was still asleep in the back seat. She said he was drunk and knocked out. For a period of time appellant was seeking his wife and, having failed to find her, he returned to the store. In the meantime, Love had taken the wife to her home after which he returned to the store and parked in front. She found her father-in-law, with whom they lived, preparing to go to town and he explained that Fred was aroused and had called for him, saying that he was in serious trouble. The wife returned with him and seeing Love in his car, parked in front, went to him while the elder Jones went into the store. She exacted a promise from Love, and gave him a like one, that neither would tell what had taken place. It transpired that appellant was not in the store, but he soon returned and shot Love as he stood at his front fender.

In rebuttal it is shown that the wife, sometime after the shooting, made a statement to the officers contrary to the testimony she gave on the witness stand. This testimony was met by partial denial and explanation by the wife that she was sick and did not remember what she told the officers. Another wit-

ness in appellant's behalf made a statement on the trial somewhat different to what he had before the grand jury. These two discrepancies were utilized by the State for the position taken before the jury, that the entire defense was fabricated, and that the two witnesses had changed their testimony to conform to the fabricated defense presented by appellant at the trial.

If the killing took place for reasons other than that stated by appellant, there is no affirmative evidence by the State, and no circumstance revealed by the record that would in the least indicate a motive for the killing. While it was a drunken party, it seems certain that no quarrel had taken place between them to mar their friendship. The case went to the jury with the contention on the part of the State that Love was murdered by Jones in cold blood, for no reason whatsoever. The defense was based on the one ground as above detailed.

Bill of Exception No 2 complains of the argument of one of the two district attorneys engaged in the prosecution. It will be important to keep in mind the foregoing in order to weigh the effect of the argument complained of. It has been frequently held that the harmfulness of improper argument depends much on the issues before the jury. We quote from Bill of Exception No. 2, in part, the argument as follows:

"I have heard of Dusty Miller for many years. When I first came to this country I heard of men that Dusty Miller had cleared of murder by the machinations of a great mind and a shrewd mind. My dear fellow, you needn't have worried one minute because Dusty Miller will take care of everything and furnish the evidence."

He said further: "* * * and I have set in cases with Dusty Miller before and I wasn't worried in the least about a defense in this case."

E. T. (Dusty) Miller is attorney for appellant.

It is improper to argue a fact not in evidence and much more so if it is a fact he would not be entitled to prove, and the effect of which is to damage the defendant. Every theory argued should be supported by allegations and proof. Branch's Ann. P. C., Sec. 364.

The certificate of the trial judge is to the effect that there is no evidence that Dusty Miller would take care of everything in the case, and "* * * there had been no evidence introduced before

the jury to show that Dusty Miller had furnished any evidence in this prosecution, nor when acting as defense counsel in any other prosecution that he had ever appeared in." He further certifies that the argument had not been provoked by anything preceding it. Upon making the foregoing argument, the court sustained the objection to it and instructed the jury to not consider it.

The right to make an argument in behalf of the State, in a prosecution, is a prized one. Likewise, it is valuable to the defense. Few questions, if any, have come to this Court with more freequency than complaints made about the argument of counsel. It would now seem unnecessary to cite authorities, much less discuss them. The argument brought before the jury a matter which must have been much in their minds, as evidenced by the penalty assessed. It is directly in support of the position taken by the prosecution that the defense was fabricated. The argument evidently had the purpose of pointing out the man who had sufficient mentality to manufacture the evidence that would bring into the case a legal defense.

Without feeling it necessary to review the' authorities presented by appellant, we do think it proper to note the answer of the State in its brief and as presented in oral argument. Reliance is first had on the court's instruction to the jury withdrawing the argument from them. This likewise is a question so frequently passed upon that a discussion would only reiterate what this Court has many times said. The brief further concludes: "It is our sincere contention that the argument of District Attorney LaFont to the jury which indicated that defense counsel E. T. (better known on the Plains as 'Dusty') Miller might have framed the evidence in this case was a benefit to the defendant, rather than an injury, for the following reasons:" A review is given in the brief of the discrepancies in the testimony of Wallace Covington, as a defense witness, and of Mrs. Jones in behalf of her husband, after which it says, "We feel confident that there is not a juror who believed any part of the defense which was testified to by the witnesses for the defendant, including the defendant himself." The prosecution thinks that a jury would be more lenient with the defendant if they should have reason to attribute a false defense to his counsel instead of to him. This argument is fanciful indeed, particularly in a case where the extreme penalty has been given. What the defense counsel says and does is as if the defendant himself were the actor.

Other arguments complained of should not have been made

but are not discussed because the harmfulness does not appear so potent.

We have examined Bill of Exception No. 4, complaining of the admission of the dying declaration. We think proper predicate was laid for the submission of the issue, which was properly done by the charge. Soon after the deceased was carried to the hospital he regained consciousness. When his mother came into the room he asked her to pray for him. She did and then said to him: "Look to the Lord; He is all that can help you now." To this he replied, "I know it, Mom; I will." He also called for his girl friend. He then said, "I don't know why that Fred would want to shoot me. There wasn't anybody mad." The doctor testified that, while nothing was said regarding the seriousness of his wounds, he was of the opinion the deceased was aware of approaching death. Under many authorities this evidence would seem to be admissible. 26 American Jurisprudence, Sec. 418; 22 Texas Jurisprudence, page 876; Keaton v. State, 57 S. W. 1125.

Furthermore, it appears to the writer that the statement was in harmony with the defense, who takes the position that they were the best of friends and that no motive existed for the killing other than the particular incident described which, from every reasonable standpoint, the deceased would not understand at that time, or ,if he did, would not care to reveal to his mother.

By Bill of Exception No. 6, complaint is made of the introduction of testimony of E. T. Dillard to the effect that in the afternoon preceding the killing appellant showed him a shotgun, in his office, and made the remark that if anybody got after him the gun would take care of things. This evidently was construed to be a threat, but there is no proof and no indication whatsoever that it related to deceased. It was probably looked upon as showing a mind regardless of social duty, fatally bent on mischief. It was calculated to have a bearing on the inquiry as to why appellant did the shooting, in the circumstances of the case now before us. In the absence of showing a motive, by the prosecution, it would be especially impressive on the jury.

The law is well settled that evidence of general threats made by defendant, when such threats are not shown to have been directed towards deceased or to embrace him, is not admissible, and especially where the only proof of malice against deceased arises subsequent to such general threat. Branch's Ann. P. C., Sec. 2073. It was said in Lucas v. State, 95 S. W. 1055, that

it is error to admit proof that defendant stated before the homicide, "When I go after anybody I generally get them." The error was based on the fact that no reference was shown to deceased, with whom he was friendly at that time. The burden is on the State to show that the threat made by defendant was directed against deceased, or that it embraced him. Duke v. State, 133 S. W. 432; Maclin v. State, 144 S. W. 951.

Unless the threat, if it be so classified, is in some way connected with the killing the objection to it should be sustained. It was prejudicial and the court by admitting it necessarily led the jury to believe that it was material on some issue. A fair consideration of all of the evidence fails to reveal either direct testimony or adequate circumstance to connect the incident with the killing. Sorrell v. State, 169 S. W. 299, pages 305-306.

For each of the errors herein discussed, the judgment is reversed and the cause remanded.